UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
SECURITIES AND EXCHANGE COMMISSION,     )
                                        )
              Plaintiff,                )
                                        )
        v.                              )        Case No.
                                        )
CUTTER FINANCIAL GROUP, LLC and         )
JEFFREY CUTTER,                         )        JURY TRIAL DEMANDED
                                        )
              Defendants.               )
_____ )

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against Defendants Cutter Financial Group, LLC ("CFG") and Jeffrey Cutter and demands a jury trial.

## PRELIMINARY STATEMENT

1.     Between at least 2014 and 2022, Jeffrey Cutter ("Cutter") engaged in a pattern of deception designed to steer his investment advisory clients to certain insurance products over other investment options, while concealing his financial motive to do so in breach of his fiduciary duties as an investment adviser.  Beginning in October 2017, Cutter perpetrated this scheme through an investment adviser firm he formed called Cutter Financial Group ("CFG").

2.     Time after time, Cutter switched clients out of annuity contracts[1] he had previously sold them into new annuity contracts without adequately disclosing his financial

---

[1] An annuity contract is a contract between the client and an insurance company in which the client makes a lump-sum payment or series of payments and, in return, receives regular disbursements, beginning either immediately or at some point in the future. While there are numerous types of annuities, the annuity type Cutter recommended to his

incentive to recommend these switches, including the substantial, up-front commissions he received from the insurance company and other third parties.  To perpetrate his scheme, Cutter made false statements to the insurance companies to effectuate the switches and generate a new round of commissions for himself.  In doing so, Cutter and CFG breached their fiduciary duties to never place their own interest ahead of their clients' interests, to disclose all material conflicts of interest, and to obtain clients' informed consent to those conflicts before proceeding.

3.     Cutter and CFG also failed to disclose the free marketing services and payments of more than $1.1 million that Cutter received from marketing firms in exchange for peddling annuities to his clients.  In doing so, they abrogated their fiduciary duty of loyalty to make full and frank disclosure of all conflicts of interest to their advisory clients and to obtain their clients' informed consent to these conflicts of interest.

4.     Through the activities alleged in this Complaint, Cutter and CFG have violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§80b-6(1), (2)], CFG has violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], and Cutter has aided and abetted CFG's violations of Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

5.     The Commission seeks: (a) a permanent injunction prohibiting the Defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the Defendants' ill-gotten gains, plus prejudgment interest; and (c) civil penalties.

---

advisory clients is a fixed index annuity, which is an annuity that provides principal protection with a potential to grow in value.

**JURISDICTION AND VENUE**

6.      The Commission brings this action pursuant to the enforcement authority

conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)].

7.      This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)

and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), 80b-14].

8.      Venue is proper in the District of Massachusetts because, at all relevant times,

Cutter lived in the District of Massachusetts and the relevant conduct occurred in the District of

Massachusetts.

9.      In connection with the conduct alleged in this Complaint, the Defendants directly

or indirectly made use of the means or instruments of transportation or communication in

interstate commerce, the facilities of a national securities exchange, or the mails.

10.     The Defendants' conduct involved fraud, deceit, or deliberate or reckless

disregard of regulatory requirements, and resulted in substantial loss, or significant risk of

substantial loss, to other persons.

**DEFENDANTS**

11.     **Jeffrey Cutter**, age 55, lives in Falmouth, Massachusetts.  Since at least 2005, he

has been an investment advisory representative associated with various investment advisory

firms.  In 2017, he founded his own investment advisory firm, Cutter Financial Group ("CFG"),

which claims to cater to retirees and soon-to-be retirees.  Cutter is the President and 50% owner

of CFG, and at all times owned, managed, and controlled CFG with his wife.  He provides

investment management advice to CFG's clients and is compensated for his services.  Cutter

actively markets his advisory business through a radio program/podcast, his YouTube channel, a

weekly article in a local newspaper, a seminar taught at a local community college, and a church

bulletin.  Cutter is also a licensed insurance agent in Massachusetts and sells insurance products to his advisory clients through **Cutterinsure Inc.**, a Massachusetts corporation he and his wife control that is a corporate affiliate of CFG.

12.     **Cutter Financial Group LLC ("CFG")** is an investment adviser incorporated in Massachusetts and headquartered in Falmouth, Massachusetts. CFG has been registered as an investment adviser with the Securities and Exchange Commission (the "Commission") since October 2017.  As of 2022, CFG claimed to manage approximately $134 million in client assets across 430 clients, most of whom were individual retail investors of retirement age.

## FACTUAL ALLEGATIONS

**A.     Cutter and CFG Owed Advisory Clients a Duty to Disclose All Conflicts of Interest**

13.     Investment advisers like Cutter and CFG have fiduciary duties to their investment advisory clients. These duties include a duty of loyalty, which is acting with the utmost good faith, making full and fair disclosure of all material facts, and employing reasonable care to avoid misleading their clients.  The duty to disclose all material facts includes the duty to disclose all conflicts of interest that might incentivize the adviser to render investment advice that is not disinterested.  To satisfy a duty of loyalty, an investment adviser who does not eliminate a conflict of interest with its advisory client must make an adequate disclosure of such conflicts of interest to the client and obtain the client's informed consent to the conflict.

14.     Here, Cutter and CFG failed to completely and accurately disclose compensation arrangements that incentivized them to recommend certain investments rather than others. Specifically, Defendants failed to adequately disclose conflicts of interest related to (1) substantial commissions Cutter received from selling annuities to his advisory clients; and (2) free marketing and other benefits provided by third party marketing firms.

15.     Cutter and CFG knew that they were required as fiduciaries to disclose all conflicts of interest, that these compensation arrangements created conflicts of interest, and that the compensation arrangements were not completely and accurately disclosed to clients.

**B.     Cutter and CFG Failed to Adequately Disclose Commissions Paid by Annuity Companies**

16.     Cutter and CFG largely manage all their advisory clients' portfolios in the same manner.  Cutter typically recommends that his advisory clients invest one third of their assets in an annuity that Cutter then sells them through Cutterinsure, and the other two thirds with a third party financial firm that manages Cutter's clients' assets for him.

17.     For the assets Cutter invests with a third party money manager, CFG clients pay CFG an annual, asset based fee to CFG of approximately 1.5%-2% of the amount of the client's assets being managed by CFG. In contrast, for the annuity sales, Cutter, directly or indirectly through Cutterinsure, receives an up-front commission from the insurance company of 7%-8% of the annuity's total value.

18.     These up-front annuity commissions enrich Cutter at the time he sells the annuity to his investment advisory clients.  Cutter receives the full 7%- 8% annuity commission upon the sale of the annuity, unlike with an asset based annual fee that ceases if the advisory client dies or otherwise terminates the relationship.  In addition, the amount of the annuity commission Cutter receives is not subject to the fluctuations of the stock market as it is with the annual, asset based fee CFG's clients pay.

19.     From 2014 to 2022, Cutter generated at least $9,340,302 in commissions from the sale of 580 annuities to his investment advisory clients.

20.     Cutter schemed to get his investment advisory clients into annuity contracts as soon as they became clients of CFG and to "replace" or "switch" annuity contracts (trade one annuity in for another) wherever possible so that Cutter could receive another 7%-8% annuity commission from the clients' purchase of the replacement annuity.  Cutter, or other CFG employees acting at Cutter's direction, often trolled for replacement options before meetings with clients and thus before Cutter could have been aware of any changes to clients' financial goals or circumstances that were typically necessary to justify switching from one annuity to another.

21.     At times, Cutter recommended that a client fund the purchase of a new annuity by cashing out an existing annuity, often one that Cutter had previously sold the client and often before the holding period, or surrender period, imposed by the annuity company had expired, thus triggering a surrender charge. [2]  In those instances, as part of a suitability review, the insurance carrier offering the new annuity required Cutterinsure to provide written justification for the switch (including an explanation of how the client's circumstances had changed) prior to it being approved.  This required suitability review was designed to protect clients from unsuitable or unnecessary annuity switches and surrender charges.

22.     However, Cutter flouted the insurance carrier's protective measures by crafting carefully worded, false and/or misleading justifications for the annuity switches to avoid red flags in the suitability review process and ensure the switches were approved by the insurance company. For example, Cutter sometimes cited a purportedly new need for an income rider or, conversely, claimed that an income rider was no longer needed, regardless of the client's actual

---

[2] The annuities Cutter sold to his advisory clients came with possible surrender charges, which is a fee the client pays if he/she terminates the annuity contract before the surrender period is up.  For example, if the surrender period is ten years, the client will incur a penalty of 10% if he terminates the contract in year one, each subsequent year the penalty will decline a percentage point, and after ten years there will be no surrender charge.

needs.[3]  His most common justification was a purported "change in the client's objectives"—even when the client's financial circumstances and goals had *not* changed. Cutter's deception was crucial to generating another round of undisclosed, up-front commissions from his clients' annuity purchases.

23.     Cutter and CFG employees working at his direction typically filled out the replacement annuity application forms ahead of a client appointment, and then directed clients to where they needed to sign, with little to no discussion of the specific provisions in the annuity applications.

24.     In total, Cutter replaced approximately 81 annuities for advisory clients between 2018 and 2022.  Of that amount, 38 were annuity contracts that Cutter had previously sold his clients and 34 were before the surrender period had expired.

25.     Nearly all of these replacement annuities were purchased from one insurance company – Insurance Company A.  Insurance Company A offered a bonus program whereby Cutter received additional payments, beyond the 7% commission, for hitting certain annuity sales levels.  In 2020, Cutter received at least $9,000 as part of this bonus program.  These incentive payments also were not adequately disclosed to CFG's advisory clients.

26.     The Defendants' scheme to replace advisory clients' annuities generated at least $974,497 in commissions, but subjected CFG's clients to unnecessary surrender charges, restarted the clock on clients' surrender periods, and/or caused clients to forgo annuity bonuses they could have been entitled to on their original annuities.[4]  In total, CFG's clients incurred

---

[3] For an extra fee, a client can obtain an income rider on the annuity that guarantees the annuity owner a paycheck until they die, even if the annuity has run out of money.

[4] Annuities often come with a bonus feature, which is a percentage of the original purchase premium that is credited to the account value on a conditional basis.  This bonus, however, typically has a vesting schedule, which means if you surrender the annuity prematurely or certain other conditions are not met, the insurance carrier re-captures the bonus and your account value declines accordingly.

more than $640,000 in surrender charges between 2018 and 2022 by virtue of the Defendants' replacement campaign.

27.     As described in the examples below, Cutter and CFG did not completely or accurately disclose to their investment advisory clients the commissions Cutter made from the sale of annuities.  These commissions — which were captured immediately and dwarfed the up-front fees CFG would have received for recommending other investments—constituted a conflict of interest that CFG and Cutter should have, but failed to, disclose.

**Client A**

28.     Client A became an advisory client of CFG's in 2015 after attending a seminar in which Cutter spoke about retirement and investments.  CFG charged Client A an annual advisory fee of 1.75% of Client A's assets under management.

29.     During her initial meetings with Cutter in 2015, Client A discussed her financial portfolio and informed Cutter that her retirement income was supported in part by her former spouse's pension but that this source of retirement income would cease upon the former spouse's death.

30.     In December 2015, Cutter sold Client A an annuity with an income rider based on Client A's need for income when her former spouse's pension payments ceased upon his death.

31.     Cutter received a commission on the annuity sale to Client A but did not disclose the amount of the commission to her.

32.     On or about December 9, 2020, in response to a general instruction from Cutter to look for annuity replacement options ahead of annual client meetings, a CFG administrative assistant noted in Client A's file that her annuity could not be replaced because the "7.5%

surrender [was] too high," meaning Client A stood to lose 7.5% of the accumulation value of the annuity if she surrendered her annuity to purchase a new one.

33.     Nevertheless, the next day, December 10, 2020, prior to Cutter's meeting with Client A, the same administrative assistant emailed a representative at Company B, (a field marketing organization, or FMO, hired to provide insurance agents with annuity sales support), again looking for a replacement annuity for Client A.

34.     The next day, December 10, 2020, Cutter persuaded Client A to replace her annuity with a new annuity issued by Insurance Company A for a principal amount of $397,622. This new annuity did not include an income rider.  Client A agreed because she trusted Cutter as her fiduciary.

35.     Immediately after the meeting, Cutter falsely made a note in Client A's file that Client A no longer needed income from her annuity.  In truth, nothing had changed with respect to Client A's financial circumstances such that she no longer required an income rider, as she still expected to lose her former spouse's pension upon his death.

36.     In the requisite paperwork for making the switch, Cutter also misrepresented to Insurance Company A that Client A no longer needed income and no longer wanted to pay for an income rider she would not use.  This was false.  In actuality, Client A's financial circumstances had not changed since Cutter sold her the original annuity in 2015.  Client A continued to need the income rider that the first annuity provided upon her former spouse's death.

37.     By surrendering her 2015 annuity, Client A lost the benefit of the income rider she continued to need and incurred a surrender charge of $26,508.  Further, the purchase of the new annuity reset the clock on the twelve year surrender period—effectively seven years beyond the surrender period from the original 2015 annuity.  In addition, the 14.5% surrender charge for

the new annuity was significantly higher than the 7.5% surrender charge remaining on Client A's original 2015 annuity.

38.     Cutterinsure received a commission on Client A's annuity switch of $23,857, but Cutter never disclosed this amount to Client A, nor the percentage of his commission, the upfront nature of the commission, nor how the annuity commission compared to the asset based annual advisory fee he received on Client A's other investments. CFG and Cutter breached their fiduciary duty of loyalty to Client A by failing to adequately disclose Cutter's commissions related to the annuity sales.

### Clients B and C

39.     In or around January 2016, Clients B and C, a married couple, became advisory clients of CFG.  As clients, CFG charged Clients B and C an annual advisory fee of 1.75% of their assets under management.

40.     In January 2016, Cutter sold Clients B and C each an annuity in the amount of $175,000 for a total principal amount of $350,000.  Although Clients B and C had no need for additional income from their annuities because they were both working full time, the two annuities Cutter sold them included an income rider for no extra fee and a 15% bonus if the annuity was held for ten years before activating the income rider.  Client B and C would lose the 15% bonus if they surrendered the annuity policies before ten years.

41.     In February 2016, Cutter sold Clients B and C a third annuity they jointly owned for a principal amount of $60,000.  All three annuities identified "growth potential" and/or "guarantees provided" as the financial objective in purchasing the products.  None identified income as a financial objective.

42.    Cutter received at least $29,200 in commissions from the three annuity sales to Clients B and C, but neither CFG nor Cutter disclosed the dollar amount or percentage of Cutter's commission, the up-front nature of the commission, or how the annuity commission compared to the asset based annual advisory fee Cutter received on Client B and C's other investments.

43.    As early as May 2019, less than four years into the 2016 annuity contracts, well within the surrender periods, and without any change in Client B and C's circumstances, Cutter began looking for replacement options for Clients B and C's annuities.

44.    Again in February 2020, before Client B and C's annual review meeting with Cutter, CFG inquired of its FMO about replacing Client B and C's annuities.  There had been no change in the couple's financial circumstances to have prompted such an inquiry.  The FMO advised against replacing Client A's 2016 annuities because the surrender charge was too high and the annuities had "performed very well."

45.    During the subsequent meeting with Cutter in February 2020, Clients B and C did not tell Cutter that their financial circumstances or objectives had changed. Nevertheless, in August 2020, before Client B and C's next appointment with Cutter, CFG twice asked a different FMO, Company B, to look into replacement options for Client B and C's three annuities. Company B provided Cutter with replacement options, even though the reasons the other FMO had cited against a switch still applied—the surrender charge remained high and the annuity continued to perform well.

46.    Thereafter, Cutter recommended that Clients B and C cash out their 2016 annuities to purchase two new annuities for a total principal amount of $400,440.  Clients B and C agreed based on their trust in Cutter as their adviser.

47.    At no point did Clients B and C tell Cutter that their financial circumstances or goals had changed, and Cutter's contemporaneous notes from his meetings with them do not reference any changed objectives.  Nevertheless, Cutter misrepresented to Insurance Company A, the new insurance carrier, that Clients B and C were replacing their annuities because their objective had changed in that they *no longer* needed guaranteed income in 2020.   This representation was misleading because Client B and C had never needed guaranteed income from their annuities.  Rather, they had always been focused on growth.

48.    By surrendering their 2016 annuities, Clients B and C incurred surrender charges of $32,468 and relinquished the 15% bonuses.  Also, the replacement annuity reset the clock on the surrender period to twelve years, essentially extending the clock six years beyond when Client B and C's original surrender periods were set to end.  In addition, the 14.5% surrender charges for the new annuities were significantly higher than the 8.75% amount remaining on their 2016 policies.

49.    Thus, unbeknownst to Clients B and C, Cutter enriched himself at the couple's expense.  Cutter yielded an undisclosed commission of at least $28,032 from Clients B and C's purchase of replacement annuities.

50.    In 2022, Cutter attempted (unsuccessfully) to replace Clients B and C's FIAs again by selling them a sixth annuity, but the couple terminated their advisory relationship with CFG instead.

51.    CFG and Cutter breached their fiduciary duty of loyalty to Clients B and C by failing to adequately disclose Cutter's commissions related to the annuity sales.

**Client D**

52.     Client D became a CFG advisory client in or around 2016.  CFG charged Client D an annual advisory fee of 1.75% of Client D's assets under management.

53.     Cutter sold Client D his first annuity in May 2016 for a principal amount of $180,000.  Client D listed among his financial objectives on the annuity application a desire for "growth, followed by income."  Consequently, the annuity he purchased included an income rider for no extra fee and a 20% bonus if the annuity was held for ten years before activating the income rider.

54.     Cutter received a lump sum commission of $12,600 for the annuity sale, a fact that CFG and Cutter failed to disclose to Client D.

55.     In or around May 2021, Cutter recommended that Client D replace his 2016 annuity with a new annuity, even though Client D's financial circumstances had not changed. Client D agreed and purchased a replacement annuity for a principal amount of approximately $220,000.

56.     In the application for the new annuity, Cutter falsely stated that Client D was replacing his 2016 annuity because he did not want to pay for an income rider he was not going to use.  However, there was no extra charge for the income rider on Client D's 2016 annuity. Cutter further misrepresented in the annuity application that Client D no longer needed or wanted the income feature from the 2016 annuity because Client D had realized his other sources of income were sufficient.  This was false—Client D's circumstances had not changed since he purchased his 2016 annuity and he wanted to keep the income rider.

57.    Client D incurred a surrender charge of approximately $3,428 for surrendering the 2016 annuity prematurely.  He also lost the free income rider and the 20% bonus associated with his 2016 annuity.

58.    In contrast, Cutterinsure earned $15,444 in commissions from the sale of the replacement annuity to Client D.  Cutter never disclosed to Client D that he would earn or had earned a lump-sum commission of $15,444 for replacing his annuity, a fact Client D would have wanted to know before agreeing to the switch.

59.    CFG and Cutter's failure to adequately disclose to Client D the commissions Cutter received on the sale of the first annuity and the replacement annuity constituted a breach of the Defendants' fiduciary duty of loyalty to Client D.

**Client E**

60.    Client E is a former salesman who retired in 2014.  Client E became an advisory client of CFG in or around 2014.  CFG charged Client E an annual advisory fee of 1.75% of Client E's assets under management.

61.    Cutter first sold Client E an annuity in January 2015 for a principal amount of $251,000.  He then sold Client E another annuity in April 2017 for a principal amount of $660,000.  Both annuities contained income riders for no extra fee and a 15% bonus if the annuities were held for ten years before activating the income rider even though Client E told Cutter he did not need income from his annuities.

62.    Cutter received commissions totaling approximately $17,629 and $43,225 from the sales of the 2015 and 2017 annuities, respectively.  Cutter did not disclose these specific amounts to Client E, the percentage of his commission, or even that he made a commission on

selling the annuities that was substantially larger than the annual, asset based advisory fee Cutter charged Client E.

63.     By January 17, 2019, at the latest, Cutter was actively looking for a replacement annuity for Client E, even though Client E had not experienced any change of circumstances to potentially warrant a switch.  Client E's net worth and monthly income were approximately the same as when Cutter sold him the prior two annuities, and he continued to collect a pension in retirement.

64.     At the meeting between Client E and Cutter on January 28, 2019, Cutter persuaded Client E to cash out the 2015 annuity to fund the purchase of a new annuity.

65.     Cutter represented to Insurance Company A in the replacement application that Client E was making the switch because, among other reasons, he is "no longer concerned about income." In truth, Client E's financial objectives had *not* changed between 2015 and 2019—income was never Client E's objective and Cutter knew it.

66.     Despite Cutter claiming that Client E's financial objectives had changed by 2019, he did not endeavor to switch the 2017 annuity until 16 months later in August 2020.  At that time, Cutter again misrepresented to Insurance Company A in the replacement application that "the client is no longer concerned with income and wants an annuity for growth, accumulation, [and to] leave to heirs."

67.     Cutterinsure received a commission of $14,773 for the sale of the 2015 annuity, $39,566 for the sale of the 2017 annuity, and a total of $54,539 in lump-sum commissions for the two switches—none of which was ever disclosed to Client E.

68.     Client E incurred surrender penalties totaling $84,652 and lost the income riders on his earlier annuities by virtue of the switches.  Cutter assured Client E that the bonus on the

new annuities would offset the penalty, but never disclosed that the bonuses were not immediate and would not vest for thirteen years.

69.     CFG and Cutter breached their fiduciary duty of loyalty to Client E by failing to adequately disclose the commissions Cutter received on the sale of the 2015 and 2017 annuities and the replacement annuities.

**Client F**

70.     Client F retired in 2013.  Client F and his spouse became advisory clients of CFG in 2014 after attending a seminar at a local school in which Cutter spoke about retirement and investments.

71.     In April 2014, Cutter sold Client F an annuity, which contained an income rider, for a principal amount of $296,000.

72.     In May 2019, Cutter recommended that Client F replace the annuity, claiming that he was switching all his clients. Client F agreed.

73.     In the required paperwork provided to Insurance Company A to explain the reason for the switch, Cutter falsely represented that Client F was "no longer concerned about income."  In fact, Client F had never been concerned about income, nor was there any change in Client F's financial situation or objectives between when Cutter sold Client F an annuity in 2014 and when he switched Client F to a new annuity in 2019.

74.     By surrendering the original annuity, Client F incurred a surrender charge of approximately $21,000.

75.     Cutter received commissions totaling at least $55,541 from Client F's two annuities purchases between 2014 and 2019, but never disclosed the dollar amount or percentage

of his commission, the up-front nature of the commission, or how the annuity commission compared to the asset based annual advisory fee Cutter received on Client F's other investments.

76.     CFG and Cutter breached their fiduciary duty of loyalty to Client F by failing to adequately disclose the commissions Cutter received from Client F's two purchases of annuities between 2014 and 2019.

**Client G**

77.     Client G became an advisory client of CFG in approximately 2015.  From the start of the relationship, Cutter pressured Client G to buy an annuity, despite Client G's professed discomfort with annuities and reluctance to tie up his money for ten years.  Eventually, Client G acceded and purchased a total of $855,000 in annuities —32% of Client G's liquid assets—at Cutter's recommendation.

78.     When Client G questioned Cutter about the commission Cutter received on the annuity sale, Cutter falsely represented to Client G that his commission was only 1%.  At a later date, he told Client G that his commission was 1.85%.   In truth, Cutter received an up-front commission of 6.5%, or $55,575, on the annuities sold to Client G.  By misrepresenting the commission he stood to earn on the annuity sale, Cutter breached his fiduciary duty of loyalty to Client G.

79.     Client G would not have purchased an annuity had he known about Cutter's up-front commission. Client G terminated his advisory relationship with CFG when he learned about the amount of commission Cutter made on the annuity sale.

**C.   The Defendants Failed to Disclose Perks Provided by Annuity Marketing Firms**

80.     Between 2014 and 2021, various field marketing organizations (FMO's) provided the Defendants with valuable benefits tied to their annuity sales, including free marketing

services and payments that were styled as expense reimbursements, but that were, in actuality, nothing more than commissions from a different source.

81.    These benefits further incentivized Cutter and CFG to recommend annuities over other investment options.  CFG and Cutter never disclosed these benefits, and the resulting conflict of interest, to their advisory clients, in breach of their fiduciary duty of loyalty.

82.    Since 2018, Cutterinsure has used Company B as its FMO. Between October 2018 and August 2022, Company B provided at least 1,567 hours of free marketing services to Cutterinsure, including designing, developing, and maintaining websites, sending blast emails to clients, preparing and reviewing various marketing materials, assisting with newspaper articles and radio shows, creating a company brochure, social media advertising, and developing marketing strategies.  These services were valued at more than $148,000—a substantial benefit to the Defendants that created a conflict of interest to use Company B to purchase annuity products for the Defendants' advisory clients.  In breach of their fiduciary duty, Defendants never disclosed this conflict to their advisory clients.

83.    Company B also paid Cutter a commission based on his sales of annuities to advisory clients, purportedly for expenses incurred in selling the annuities. Initially, this payment was 1%, but later, in 2019, Cutter negotiated the commission up to approximately 1.5% based on his level of annuity sales.  These amounts were on top of the 7% commission Cutter already received from the insurance companies directly.

84.    In total, Company B paid Jeffrey Cutter approximately $470,000 in commissions between 2019 and 2021.

85.    Company B paid CFG commissions of $5,006 on Client A's 2020 replacement annuity, $4,970.28 on Client B's 2020 replacement annuity, approximately $2,758 on Client C's

2021 replacement annuity, $3,078 on Client D's 2019 replacement annuity, and $6,539 on Client E's 2019 replacement annuity. None of these commission amounts were disclosed to these CFG advisory clients.

86.    Between 2016 and 2018, Cutterinsure employed Company C as its FMO. Company C agreed to pay Cutter a commission of 1% based on his annuity sales. This amount was on top of the 7% commission Cutter already received from the insurance company directly. In addition, Company C provided Cutter with other benefits, including paid trips, for reaching certain annuity sales levels.

87.    In total, Company C paid CFG more than $500,000 in commissions and rewards program payments. The 1% commission and the reward program created a conflict of interest for the Defendants to use Company C to purchase products for the Defendants' advisory clients. Nevertheless, the Defendants never disclosed this conflict to their advisory clients.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act by CFG and Cutter

88.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-87 above.

89.    At all relevant times, Cutter and CFG were investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

90.    Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)] provide that it is unlawful for an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud a client or prospective client; or (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

91.     As a result of the misconduct alleged above, Cutter and CFG have violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act.

## SECOND CLAIM FOR RELIEF

### Violation of 206(4) of the Advisers Act and Rule 206(4)-7 thereunder by CFG and Aiding and Abetting by Cutter

92.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-87 above.

93.     Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 promulgated thereunder [17 C.F.R. § 275.206(4)-7] provide that it shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business for any registered investment adviser, directly or indirectly, to fail to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules promulgated thereunder.  Investment advisers must also review, no less frequently than annually, the adequacy of those policies and procedures and the effectiveness of their implementation.

94.     As set forth above, CFG failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules promulgated thereunder by CFG and its supervised persons.

95.     As a result, CFG has violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], and unless restrained and enjoined will continue to violate these provisions.

96.     Cutter knowingly and recklessly provided substantial assistance to CFG's violation of Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

97.     As a result, Cutter aided and abetted CFG's violations of CFG has violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], and unless restrained and enjoined, will continue to aid and abet such violations.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Cutter and CFG, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1)];

B.     Require Cutter and CFG to disgorge all ill-gotten gains, plus prejudgment interest;

C.     Order Cutter and CFG to pay an appropriate civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/  Susan Cooke Anderson

Susan Cooke Anderson (D.C. Bar No. 978173)
     Trial Counsel
Amy Harman Burkart (Mass. Bar No. 651828)
     Trial Counsel
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-4538  (Anderson direct)
(617) 573-4590  (fax)
andersonsu@sec.gov  (Anderson email)

Dated:  March 17, 2023