**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) **Case No. 23-cv-10589-DJC** |
| CUTTER FINANCIAL GROUP, LLC, and JEFFREY CUTTER, | ) ) ) |
| Defendants. | ) ) ) ) |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                                    December 14, 2023

## I.      Introduction

Plaintiff Securities and Exchange Commission ("SEC") has filed this lawsuit against the Defendants Cutter Financial Group ("CFG") and Jeffrey Cutter ("Cutter") (collectively, "Defendants") for violations of Investment Advisers Act, 15 U.S.C. § 80b, *et seq.* ("Advisors Act").  D. 15.  Defendants have moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  D. 21.  For the reasons stated below, the Court DENIES the motion to dismiss.

## II.     Standard of Review

### A.      <u>Lack of Subject Matter Jurisdiction</u>

Under Fed. R. Civ. P. 12(b)(1), a defendant can move to dismiss an action in federal court based upon a lack of subject matter jurisdiction.  "'Because federal courts are courts of

limited jurisdiction, federal jurisdiction is never presumed.'" <u>Fábrica de Muebles J.J. Álvarez,</u> <u>Incorporado v. Inversiones Mendoza, Inc.</u>, 682 F.3d 26, 32 (1st Cir. 2012) (quoting <u>Viqueira v.</u> <u>First Bank</u>, 140 F.3d 12, 16 (1st Cir. 1998)).  Instead, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995) (quoting <u>Taber Partners, I v. Merit Builders, Inc.</u>, 987 F.2d 57, 60 (1st Cir. 1993)).  In other words, once a defendant challenges the jurisdictional basis for a claim in federal court pursuant to Fed. R. Civ. P. 12(b)(1), the plaintiff has the burden of proving that jurisdiction exists. <u>Johansen v. United States</u>, 506 F.3d 65, 68 (1st Cir. 2007).

When considering a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." <u>Aversa v.</u> <u>United States</u>, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing <u>Murphy</u>, 45 F.3d at 522).  The Court also "may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in the case." <u>Id.</u> at 1210.

**B.**   <u>**Failure to State a Claim**</u>

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." <u>Schatz v. Republican State Leadership</u> <u>Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. <u>Id.</u>  Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit. <u>Id.</u>  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." <u>Haley v. City of Boston</u>, 657

F.3d 39, 46 (1st Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." <u>García-Catalán</u>, 734 F.3d at 103 (quoting <u>Iqbal</u>, 556 U.S. at 678).  On a Rule 12(b)(6) motion, the Court may also consider documents incorporated into the complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiffs' claim" and "documents sufficiently referred to in the complaint." <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

## III.    Factual Background

The following facts are drawn from the SEC's amended complaint, D. 15, and are accepted as true for the purposes of resolving Defendants' motion to dismiss.

Cutter has worked as an investment adviser since at least 2005. <u>Id.</u> ¶ 13.  Cutter is also a licensed Massachusetts insurance agent.  <u>Id.</u>  Cutter formed CFG in 2006, while he was associated with other investment advisory firms, and began doing business under the CFG name around September 2011.  <u>Id.</u> ¶ 14.  In October 2017, Cutter registered CFG as an investment adviser with the SEC.  D. 15 ¶ 14.  Cutter held himself and CFG out as fiduciaries of their clients. <u>Id.</u> ¶¶ 22–23.  CFG's website indicated that it advised clients on a "step-by-step financial strategy process that addresses [sic] all of their retirement needs from: retirement income including Social [sic] security and pension distribution strategies, **tax minimization**, conservative investment strategies, legacy planning, **insurance strategies** and planning for the unexpected and the inevitable."  <u>Id.</u> ¶ 23 (alterations and emphasis added in original).  Cutter also owns and operates Cutterinsure Inc. ("Cutterinsure"), a corporate affiliate of CFG that sells insurance products. <u>Id.</u> ¶ 13.  Cutter operates CFG and Cutter out of the same offices and with the same employees. <u>Id.</u>

As alleged, Defendants managed all clients' portfolios using a "three buckets" approach. Id. ¶ 24.  Defendants advised clients to invest one-third of their assets in an annuity sold by Cutter and the remaining two thirds in an account managed by a third-party money manager.  Id. By purchasing an annuity, Cutter's clients entered a contract with an insurance company to receive regular disbursements beginning at some future time in exchange for paying the insurance company a lump-sum or series of payments.  Id. ¶ 2 n.1.  Typically, Cutter recommended a fixed index annuity ("FIA"), which "purports to provide principal protection with a potential to grow in value." Id.

Cutter did not disclose various incentives that might influence his decision to recommend annuities over other investments, including that he received substantially higher commissions by selling annuities than Defendants earned in advisory fees for investing assets with a third-party money manager.  Id. ¶ 26.  For the two-thirds of client assets held by the third-party money manager, CFG received an annual, asset-based fee of approximately 1.5% to 2% of the total amount of assets managed.  Id.  For the annuity sales, the insurance company paid Cutter, and at times CFG, an up-front commission of approximately 7% to 8% of the annuity's total value.  Id. Field marketing organizations that facilitated Cutter's sale of annuities also provided CFG with commissions, free marketing services and supposed expense reimbursements tied to the annuity sales, totaling hundreds of thousands of dollars.  Id. ¶¶ 38–44.

Cutter also recommended that clients switch or replace their annuities only few years after they purchased them, generating another round of commissions for Defendants on the sale of the replacement annuities.  Id. ¶¶ 27–28.  Most of the replacement annuities were purchased from an insurance company identified as Company A, which offered Cutter bonuses for hitting annuity sales levels, in addition to his usual commission on such sales.  Id. ¶ 35.

By terminating their annuities early, clients typically incurred a "surrender charge" or forfeited bonuses to which they would otherwise have been entitled.  Id. ¶¶ 28 n.3, 36 n.5.  The SEC alleges that Cutter also failed to advise clients of other adverse consequences of his advice, including resetting the surrender period (the period after which the client could terminate the annuity without incurring a fee) or tax liabilities of selling other assets, such as securities, to fund an annuity purchase.  Id. ¶¶ 28 n.3, 36, 46.  As alleged, the decision to replace annuities was not motivated by any change in the clients' financial circumstances or investment goals, but rather in Cutter's desire to earn another round of commissions.  Id. ¶ 31.  Relatedly, Defendants also allegedly lied about changes in clients' circumstances and goals on replacement annuity applications which were "designed to protect clients from inappropriate annuity switches and unnecessary surrender charges."  Id. ¶¶ 30–32; see id. ¶¶ 54–56, 66–68, 77–78, 88–89, 96 (alleging false or misleading representations on annuity applications for specific clients).  The amended complaint contains allegations specific to eight clients (identified as Clients A through H) who were allegedly injured by Cutter in this manner.  Id. ¶¶ 47–108.  The SEC also alleges that Cutter and CFG did not adopt or implement any written policies or procedures relating to annuities or insurance products, or which otherwise addressed the conflict of interest "inherent" in the sale of FIAs to advisory clients.  Id. ¶¶ 109–11.

## IV.    Procedural History

The SEC instituted this action on March 17, 2023, and subsequently amended its complaint.  D. 1, 15.  Defendants have now moved to dismiss the amended complaint.  D. 21.  Three *amicus curiae*, the National Association for Fixed Annuities ("NAFA"), Finseca, and the Investor Choice Advocates Network ("ICAN"), filed briefs in support of Defendants.  D. 47; D. 48; D. 51.  The Court heard the parties on the pending motion on and took the matter under advisement.  D. 55.

## V.    Discussion

### A.    Whether 12(b)(6) Supplies the Appropriate Standard of Review

The amended complaint asserts that this Court has subject matter jurisdiction pursuant to §§ 209 and 214 of the Advisers Act, which provide federal district courts jurisdiction over violations of the Advisers Act and actions to enforce the Advisers Act.  15 U.S.C. §§ 80b-9(d), (e), 80b-14; see D. 15 ¶ 9.  In addition, because the cause of action arises under a federal statute, jurisdiction also exists under 28 U.S.C. § 1332.  See, e.g., SEC v. Aequitas Mgmt., LLC, No. 3:16-CV-438-PK, 2017 WL 7789714, at *1 (D. Or. May 30, 2017); SEC v. Battoo, 158 F. Supp. 3d 676, 681 n.1 (N.D. Ill. 2016); SEC v. Valente, No. 14 CV 3974 VB, 2015 WL 5501611, at *1 (S.D.N.Y. Aug. 28, 2015).

As acknowledged by counsel at the motion hearing, Defendants' argument regarding subject matter jurisdiction is indistinguishable from their argument that the SEC has not stated a claim under the Advisers Act.  D. 56 at 5; D. 22 at 15 (arguing that "[t]he SEC's failure to state an Advisers Act claim also puts this case beyond federal subject-matter jurisdiction").  Under First Circuit law, a federal claim will only be deemed insufficient to confer subject matter jurisdiction in "only the most extreme cases," where the claim is "wholly insubstantial and frivolous."  Toddle Inn Franchising, LLC v. KPJ Assocs., LLC, 8 F.4th 56, 62 (1st Cir. 2021).  Courts have concluded that arguments similar to those raised by Defendants in this case are more appropriately evaluated under Rule 12(b)(6), than Rule 12(b)(1).  Futura Dev. Corp. v. Centex Corp., 761 F.2d 33, 38 (1st Cir. 1985) (stating that "district court properly treated [defendant's] motion to dismiss as a motion on the merits [of the § 10(b) Securities Exchange Act claim] rather than a 12(b)(1) motion to dismiss for lack of jurisdiction since the basis of jurisdiction was also an element of the plaintiff's cause of action"); SEC v. Stanford Int'l Bank, Ltd., No. 3:09-CV-0298-N, 2011 WL 13160374, at *1–2 (N.D. Tex. Nov. 30, 2011) (concluding that motion to

dismiss for lack of subject matter jurisdiction should be construed as 12(b)(6) motion where defendant resisted Advisers Act and other securities law claims on basis that "CDs are not 'securities'" (quoting <u>Meason v. Bank of Miami</u>, 652 F.2d 542, 547 (5th Cir. 1981))). Accordingly, the Court concludes that the SEC's claim under the Advisers Act is not so insubstantial and frivolous to warrant dismissing this case for lack of federal subject matter jurisdiction and will instead analyze the arguments regarding the scope of the Advisers Act under the Rule 12(b)(6) standard.

> **B.      Whether the SEC States a Claim Under the §§ 206(1) and 206(2) of the Advisers Act Based Upon Investment Advice Regarding FIAs**

The SEC alleges that Defendants violated §§ 206(1) and 206(2) of the Advisers Act.  D. 15 ¶¶ 113–16.  These provisions of the Act make it "unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly— (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. § 80b-6(1)–(2).  For the purposes of this motion to dismiss, Defendants do not dispute the alleged use of the mails or means or instrumentality of interstate commerce.  The Court thus addresses whether the SEC has plausibly alleged the remaining elements of the claim.

> *1.      Whether Defendants Were Investment Advisers*

An "investment adviser" is "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  15 U.S.C. § 80b-2(11).  Here, the SEC has plausibly alleged, and Defendants do not appear to dispute, that CFG is a registered investment adviser, that Cutter is the owner and operator of CFG, that the clients identified in the complaint were advisory

clients of Cutter and CFG and that Cutter himself provided financial advice regarding securities to those clients.  D. 15 ¶¶ 13–14, 24, 59, 61, 75, 84, 94, 101, 105–06; see D. 22 at 17 (referring to CFG's investment advisory agreements with its clients).  Further, Cutter and CFG charged a 1.75% annual advisory fee to the identified clients.  D. 15 ¶¶ 13, 26, 47, 59, 73, 82.

Defendants attach Clients B and C's investment advisory agreement with CFG and argue that the agreement "limit[s] the scope of investment advisory services to advice about securities held in clients' brokerage accounts, which did not include FIAs."  D. 22 at 17 (citing D. 22-14).  The Court is skeptical that the advisory agreement actually purports to limit the scope of the adviser-client relationship or of Defendants' fiduciary duties to their clients.  See D. 22-14 at 2 (granting CFG power and authority to direct investments in client accounts and execute its investment recommendations without prior client approval of each specific transaction).  Putting that aside, the only legal support Defendants cite for the proposition that the scope of their fiduciary obligations should be limited by the terms of the investment advisory agreements is Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA-5248, 84 Fed. Reg. 33669 (June 5, 2019).  That very guidance, however, indicates that "the adviser and its client may shape [their] relationship by agreement, *provided that there is full and fair disclosure and informed consent*."  84 Fed. Reg. 33671 (emphasis added).  Courts do not allow investment advisers to contract around their fiduciary obligations to their clients.  See SEC v. Criterion Wealth Mgmt. Servs., Inc., 599 F. Supp. 3d 932, 950 (C.D. Cal. 2022) (explaining that "the Advisers Act governs investment advisers by operation of law, and advisers may not sign contracts with clients waiving the clients' rights under the Advisers Act by simply calling investment advising activity something else"); SEC v. Haarman, No. A-21-CV-00235-LY, 2022 WL 2782648, at *3 (W.D. Tex. Jan. 25, 2022) (concluding that SEC had stated Advisers Act

claim and explaining that definition of "Portfolio Security" in advisory agreement was "not controlling"), report and recommendation adopted, 2022 WL 2763163 (W.D. Tex. Mar. 11, 2022).

Thus, Defendants are investment advisors within the meaning of the Advisers Act.[1]

> ###### 2.    *Whether Defendants Engaged in Fraud or Deceit With Respect to Clients*

Section 206 "imposes a fiduciary duty on investment advisers to act at all times in the best interest of . . . investors," including by making a "full and fair disclosure of all material facts." SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) (quoting SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 194 (1963)), opinion withdrawn on other grounds, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated in part on reh'g, 597 F.3d 436 (1st Cir. 2010).  "Failure to disclose material facts must be deemed fraud or deceit." Cap. Gains, 375 U.S. at 200.  A fact is "material" if "there is a substantial likelihood that [it] would affect the behavior of a reasonable investor." SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008).

As alleged, Cutter failed to disclose to advisory clients that his incentive to recommend that clients invest their assets in FIAs was significantly higher than his incentive to advise clients to invest in other options, including securities or the third-party money management account he also recommended to clients.  D. 15 ¶ 26.  Such omission is material.  See Cap. Gains, 375 U.S. at 196 (explaining that "[a]n investor seeking the advice of a registered investment adviser must . . . be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving 'two masters' or only one, 'especially . . . if one of the masters happens to be economic self-interest'" (quoting United States v. Miss. Valley Generating

---

[1] Defendants and *amici* also argue that Defendants were not acting within their roles as investment advisors, but rather as insurance agents, when they sold annuities.  The Court addresses this argument at pp. 14-17, infra.

Co., 364 U.S. 520, 549 (1961))); SEC v. Slocum, Gordon & Co., 334 F. Supp. 2d 144, 182

(D.R.I. 2004) (explaining that "[p]otential conflicts of interest are always material").

Defendants nevertheless argue that Cutter sufficiently disclosed the conflict of interest

because "Massachusetts [insurance] regulations require disclosure of the *fact* of compensation

but not the *amount* unless the consumer requests it."[2]  D. 22 at 24.  The SEC, however, does not

bring this action under Massachusetts insurance law, but under the Advisers Act, which requires

full disclosure of all material conflicts of interest.  The material omission is not merely that

Cutter obtained any commission for the sale of FIAs, but that the up-front commission rate

Cutter earned from annuities was higher than the fee he earned when he advised clients to invest

their funds in a money management account.  D. 15 ¶ 26; SEC v. Cmlth. Equity Servs., LLC,

No. 1:19-CV-11655-IT, 2023 WL 2838691, at *13 (D. Mass. Apr. 7, 2023) (concluding that

adviser breached fiduciary duty where conflict disclosure omitted mention of specific revenue

sharing arrangement and did not identify which funds the arrangement was tied to and explaining

that "what is required is a picture not simply of the show window, but of the entire store . . . not

simply truth in the statements volunteered, but disclosure" (alteration in original) (quoting Cap.

Gains, 375 U.S. at 201)).

Defendants also urge this Court to consider disclosures included in the Form ADVs filed

by CFG between 2017 and 2022.  D. 22 at 12; D. 26 at 8.[3]  Even considering these documents,

the disclosures do not defeat the allegations in the amended complaint about breach of the

---

[2] To the extent that Defendants argue that the state insurance regulation regime created a lack of fair notice or otherwise precludes the SEC from enforcing the Advisers Act, the Court addresses those arguments at pp. 22-24, infra.

[3] Form ADVs are documents that registered investment advisers file annually with the SEC.  D. 22 at 12 n.8.  Because Form ADVs are publicly available on the SEC's website, courts may take judicial notice of them.  See BBAM Aircraft Mgmt. LP v. Babcock & Brown LLC, No. 3:20-CV-1056 (OAW), 2022 WL 4080383, at *2 n.2 (D. Conn. Mar. 23, 2022); Fleming v. Fid. Mgmt. Tr. Co., No. 16-CV-10918-ADB, 2017 WL 4225624, at *7 n.3 (D. Mass. Sept. 22, 2017).

Defendants' fiduciary duties.   In particular, the phrase "may earn commission-based compensation" in these disclosures indicates that the conflict of interest is merely hypothetical and does not disclose either that Cutter in fact did earn commissions or that those commissions were earned at a higher rate than other investment options he could have recommended to plaintiffs.  D. 22-1 at 3; see Cmlth. Equity Servs., 2023 WL 2838691, at *13 (concluding that disclosures were inadequate where adviser "presents the payments it receives from the revenue sharing arrangement as a hypothetical rather than disclosing it as a matter of fact"); SEC v. Westport Cap. Mkts. LLC, 408 F. Supp. 3d 93, 102 (D. Conn. 2019) (explaining that Form ADV "only disclosed that [adviser] "may" receive such commissions or fees that would create that conflict, rather than the whole truth: that the firm did receive compensation that created a conflict").

Nor is it clear that disclosures from the relevant insurance companies (which were not incorporated into the complaint) fulfill Defendants' fiduciary obligations.  See D. 22-10 at 5.  As alleged by the SEC, not all clients were provided notice of Cutter's receipt of commissions, bonuses and marketing services.  D. 15 ¶ 111.  Indeed, while the annuity applications of some clients apparently contained the disclosure quoted in Cutter's memorandum, D. 22 at 11 (quoting D. 22-10 at 5), other clients' applications contained more limited disclosures, see, e.g., D. 22-41 at 10.   Moreover, the insurance company disclosures do not mention that the up-front commission rate for the FIAs is higher than the typical advisory fees Cutter would earn, or explain that this difference creates a conflict of interest when Cutter recommends FIAs to investment clients.  See D. 22-10 at 5.

    3.   *Scienter and Negligence*

As to the requisite mental state, "[a] violation of Section 206 (1) requires a determination that the adviser acted with scienter, while proof of 'simple negligence' satisfies Section 206(2)."

SEC v. Duncan, No. 19-cv-11735-KAR, 2021 WL 4197386, at *13 (D. Mass. Sept. 15, 2021) (quoting Robare Grp., Ltd. v. SEC, 922 F.3d 468, 472 (D.C. Cir. 2019)).  To assess whether the SEC has adequately alleged scienter, this Court must "evaluate 'the complaint in its entirety' to determine 'whether all of the facts alleged, taken collectively' meet the scienter standard." Tambone, 550 F.3d at 120 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007)).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud" and is shown where "defendants acted with a high degree of recklessness or consciously intended to defraud."  SEC v. Fife, 311 F.3d 1, 9 (1st Cir. 2002) (internal citations and quotation marks omitted).

Here, the Court can plausibly infer from the allegations in the amended complaint that Cutter and CFG, experienced investment advisers, knew that they were compensated at a higher rate when client assets were used to purchase annuities rather than invested in securities.  D. 15 ¶¶ 13–14, 26, 46.  Instead of disclosing this incentive to clients, Cutter and CFG allegedly promoted annuities even for clients for whom such investments were not suitable and acquired replacement annuities for clients even when the clients' needs had not changed.  Id. ¶¶ 24, 26–28; see id. ¶¶ 52–54 (alleging that one day after another CFG employee noted that Client A was not suitable for an annuity replacement due to the size of the surrender charge that would be incurred, Cutter persuaded Client A replace her annuity with another annuity that did not meet her income needs).  As alleged, Defendants' motive for the omission is evident from the financial incentive Cutter had to sell annuities.  See Duncan, 2021 WL 4197386, at *14 (quoting Tellabs, 551 U.S. at 325).  In two instances, Cutter allegedly lied to Client G regarding the commissions he received from annuities.  D. 15 ¶ 102; see Duncan, 2021 WL 4197386, at *14 (concluding that misrepresentation to client as to adviser's stake in fraudulent scheme was

"additional evidence of Defendant's conscious intent to defraud").  Cutter also allegedly was untruthful about changes in his clients' needs and objectives when he applied on their behalf to switch annuities.  D. 15 ¶ 31.  Reading the complaint as a whole, the Court may plausibly infer that Defendants acted with the scienter required under § 206(1).  Because the negligence required by § 206(2) is a less demanding standard than scienter, the Court concludes that the SEC also has plausibly alleged the requisite *mens rea* under both §§ 206(1) and 206(2).

The Court is not persuaded by Defendants' argument that scienter requires knowledge of what the legal requirements for disclosure should have been or can only be shown if Cutter himself drafted the inadequate disclosures.  D. 22 at 24–25.  Scienter focuses on whether the adviser had an intent to deceive, manipulate or defraud the client, see Fife, 311 F.3d at 9, which, as discussed above, has been plausibly alleged here.

Further Defendants argue that the apparent failure to warn Clients A, G, and H of tax consequences relating to the liquidation of their securities sales does not support scienter because paying taxes is not "*per se* fraudulent" and the SEC has not alleged how the securities sales caused the clients to owe more taxes than they would have owed using another investment strategy.  D. 22 at 26; D. 26 at 15–16.  On a motion to dismiss, however, this Court must draw plausible inferences in the SEC's favor and credit the SEC's allegations of the negative tax related consequences of Cutter's actions.  See, e.g., D. 15 ¶ 101 (alleging that "Cutter sold Client G's securities, triggering a substantial capital gains tax and adversely impacting Client G's social security benefits" despite "G's professed concerns about incurring a potential tax liability from the sale and his admonitions to Cutter about not selling securities without his permission").  Moreover, the SEC does not rely solely on the failure to advise clients of the tax consequences of selling their securities to support their claim of scienter, but also relies upon allegations that

Defendants engaged in a scheme which hid a known conflict of interest from advisory clients, lied to at least one client about that conflict of interest and misrepresented client objectives to insurers. Such allegations are sufficient to permit this Court to infer scienter on a 12(b)(6) motion.

In sum, the Court that the SEC has plausibly alleged violations of §§ 206(1) and (2) of the Advisers Act. Defendants nevertheless raise various arguments as to why the status of FIAs as insurance products rather than securities precludes this enforcement action. The Court addresses each in turn.

4.   *Whether the SEC Can Regulate Advice That Advisory Clients Purchase Non-Securities*

Defendants' primary argument is that the SEC is not empowered by the Advisers Act to regulate insurance sales (including the sale of annuities). D. 22 at 15–19. Defendants argue, and the SEC does not dispute, that the FIAs at issue in this case are not "securities." Id.; D. 23 at 4 (stating that "the allegations in the complaint and the application of the Advisers Act are *not* premised on the notion that the annuities Cutter sold his advisory clients are securities"). Thus the Court assumes, without deciding, for the purpose of this litigation that FIAs are insurance products, rather than securities.

Defendants emphasize that an investment adviser "advis[es] others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." D. 22 at 15; 15 U.S.C. § 80b-2(11). According to Defendants, because FIAs are not securities, Cutter was not acting as an investment adviser when he sold FIAs, but rather in his separate role as a licensed insurance agent. Id. at 15–17. The SEC instead characterizes its claims as arising from "the advisory-client relationship between Cutter and the clients alleged in the Complaint" and

emphasizes that § 206 contains no requirement that the fraud perpetrated by an investment advisor be related to the sale of securities.  D. 23 at 4-5.

Defendants are correct that being an investment adviser is a threshold requirement for Advisers Act liability.  D. 22 at 16.  As explained above, however, that threshold is met here, where CFG was a registered investment adviser, Defendants received advisory fees for client assets pursuant to advisory agreements.  D. 15 ¶¶ 13–14, 26, 47, 59, 73, 82; D. 22 at 10 (citing D. 22-14); see Kassover v. UBS AG, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008).[4]  The Court concludes that the SEC's claim is not barred simply because the conflict of interest in this case involves FIAs.  The violation of the Advisers Act in this case arises not from the fact that Defendants sold annuities, but rather that Defendants recommended that advisory clients spend a third of their total assets buying FIAs from Cutter without fully and fairly disclosing Cutter's alleged conflict of interest.

Another session of this Court held that an investment advisor who persuaded his clients to send money to an inheritance scam in Turkey, violated the Advisers Act by failing to disclose material fact (i.e., his own private investment and relationship with the recipient).  See Duncan, 2021 WL 4197386, at *10–11.  There was no evidence that either the investment advisor or the advisory clients in Duncan believed that they were investing in securities by sending money to defendant's contact in Turkey, or even that the clients would otherwise have invested their money in securities.  See id. at *1–7.  Duncan also argued that the fraud occurred in the context of close friendships rather than the advisory relationship and noted that clients were not charged

---

[4] The Court is not persuaded by *amicus* FINSECA's argument that definition of "client" in the Form ADV Glossary would exclude the clients referred to in the amended complaint.  D. 48 at 21 (quoting D. 48-1 at 4).  The definition states that "[i]f your firm provides other services (e.g., accounting services), this term does not include clients that are not investment advisory clients."  D. 48-1 at 4.  Here, the SEC alleges that the clients *are* investment advisory clients who were also sold insurance agreements.  D. 15 ¶¶ 24-28.

management fees related to the funds they sent to Turkey. Id. at 12. The Court rejected this defense, concluding that the defendant "cannot divorce himself from his role as investment adviser" where he had a financial interest in the success of the scheme and was trusted by his clients to make recommendations in their best interest. Id. In the present case, this Court agrees that investment advisors cannot enrich themselves at the expense of their advisory clients by directing clients to invest their assets in something that is not a "security" without full and fair disclosure required by the Advisers Act.[5]

Duncan's reasoning is supported by statutory language. The antifraud provisions of the Securities Act and the Exchange Act require that the wrongful conduct involve "the purchase or sale of any security," 15 U.S.C. § 78j, or "the offer or sale of any securities," 17 U.S.C. § 77q, respectively. By contrast, the relevant sections of Advisers Act do not contain any requirement that the defendant's wrongful conduct be in connection with the purchase, sale or offer of securities. See 15 U.S.C. § 80b-6(1), (2). This language omission accords with the "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline as investment adviser—consciously or unconsciously—to render advice which was not disinterested." Cmlth. Equity Servs., 2023 WL 2838691, at *9 (quoting Cap. Gains, 375 U.S. at 190–91). In light of the difference in statutory language, the Court is not persuaded by the amici's citation to cases regarding application of the Securities Act, Exchange Act or other

_____

[5] Nor does the SEC take a "novel approach" in pursuing its claims here as to Cutter and CFG as Defendants argue, having previously sought to enforce the requirements of the Investment Advisers Act against advisers who sold insurance products to advisory clients. See SEC v. Springer, No. 19-cv-02559 (E.D. Cal. filed Dec. 19, 2019), D. 1, D. 29, D. 30 (issuing final judgments where SEC alleged that investment adviser placed advisory clients in fixed index annuities without disclosing compensation arrangements that provided adviser with more compensation and benefits for directing clients to annuities over other investments); SEC v. Burroughs, No. 19-cv-01913 (D. Conn. filed Dec. 4, 2019), D. 1, D. 20 (issuing final judgments where SEC alleged that investment advisor sold advisory clients fictitious "Guaranteed Interest Contract[s]" from insurance company).

statutes requiring a connection between the wrongful conduct and the purchase or sale of a security.  D. 47 at 15–17 (citing cases); D. 48 at 18 n.2 (collecting cases).

The Court thus rejects Defendants' argument that an individual who falls within the statutory definition of investment adviser need not disclose any conflicts of interest arising from a non-security or can ignore their fiduciary obligations when recommending that clients invest assets in a non-security.

a)    Regulation Best Interest

Nor is the Court convinced by Defendants' (or the *amici*'s) analogy to Regulation Best Interest ("Reg BI"), which imposes certain non-fiduciary obligations on broker-dealers "when making a recommendation of any securities transaction or investment strategy involving securities." 17 C.F.R. § 240.15l-1; see D. 22 at 16–17; D. 26 at 12; D. 27 at 24–25; D. 48 at 11–13.  SEC guidance explains that "[w]here a financial professional who is dually registered [as a broker and investment adviser] is making an account recommendation to a retail customer, whether Regulation Best Interest or the Advisers Act will apply will depend on the capacity in which the financial professional making the recommendation is acting."  84 Fed. Reg. 33339–40. Later in the comments, the SEC explains that "a dual-registrant is an investment adviser solely with respect to those accounts for which a dual-registrant provides investment advice or receives compensation that subjects it to the Advisers Act."  D. 22 at 16 (quoting 84 Fed. Reg. 33345).  It is not clear that Reg BI and the regulatory scheme for broker-dealers offers much guidance given the allegations in this case.  The Advisers Act carves broker-dealers out of the definition of investment adviser, 15 U.S.C. § 80b-2(a)(11) (excluding from the definition of "investment adviser" "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation

thereof"), and thus the SEC is statutorily required to distinguish when investment advice is given pursuant to each role.

Even if the Court concluded that it should treat Cutter as a sort of "dual registrant," the cases cited by Defendants provide no guidance because they do not involve dual-registrants acting as both broker and adviser with respect to the same clients, but rather defendants who provided only brokerage services to plaintiffs.  See D. 22 at 16 n.16 (citing cases); see, e.g., Kassover, 619 F. Supp. 2d at 32 (dismissing Advisers Act claim where plaintiff and defendant were party to brokerage agreements, not advisory agreements, and defendants recommended certain securities in that context); Polera v. Altorfer, Podesta, Woolard & Co., 503 F. Supp. 116, 119 (N.D. Ill. 1980) (dismissing Advisers Act claim where plaintiff alleged that defendants received compensation for services that were incidental to brokerage business).  One case cited by Defendants involved a defendant who was neither a broker nor an investment adviser, but who merely conveyed information regarding a real estate sale to his business partners.  Wang v. Gordon, 715 F.2d 1187, 1192 (7th Cir. 1983) (concluding that general partner was not investment adviser when he advised limited partners of the terms of a sale of real property which included securities transfer, because general partner "did not issue reports concerning securities as part of a regular business" and "was not compensated for information regarding securities").

Indeed, cases that have analyzed whether dually-registered broker-dealers violated the Advisers Act have not allowed such dual-registrants to shirk their fiduciary obligations as investment advisers.  See Criterion Wealth, 599 F. Supp. 3d at 949 (concluding that defendants acted as broker-dealers and investment advisers simultaneously and noting that defendants' arguments that they were acting as only broker dealers "miss the broader point"); Westport Cap., 408 F. Supp. 3d at 100, 106–08 (granting summary judgment for SEC on § 206(2) claim where

dual-registrant failed to disclose to advisory clients that it was earning broker-dealer fees on clients' mutual fund trades, in addition to clients' advisory fee).[6]

For these reasons, the Court concludes that Reg BI does not support interpreting the Advisers Act to bar the present action.

        b)    Rule 151A

Defendants and *amicus* ICAN also cite Am. Equity Inv. Life Ins. Co. v. SEC, 613 F.3d 166 (D.C. Cir. 2010), for the proposition that the SEC lacks authority to regulate FIAs.  D. 22 at 17; D. 51 at 9–11.    In Am. Equity, the D.C. Circuit did not examine whether the Advisers Act could reach an investment adviser who sold annuities to advisory clients, but instead struck a rule regulating FIAs promulgated under the Securities Act because the SEC failed to consider "the efficiency, competition, and capital formation effects" of the new rule as required by the Securities Act.[7] Am. Equity, 613 F.3d at 176–79.  Accordingly, Am. Equity does not resolve the precise legal issue before the Court.

      5.    *Whether Application of the Advisers Act to Defendants Is Barred by the McCarran-Ferguson Act*

Defendants and *amicus* NAFA argue that the McCarran-Ferguson Act precludes liability in the instant case.  D. 22 at 18–19; D. 26 at 10–11; D. 47 at 17–20.  In particular, Defendants argue the Advisers Act cannot apply here because state insurance regulation (1) imposes no fiduciary duty on insurance agents, (2) deems receipt of compensation to be not a material

---

[6] The court in Westport Cap. denied summary judgment on the § 206(1) claim due to a genuine dispute of fact as to scienter.  Westport Cap., 408 F. Supp. 3d at 106.  The SEC ultimately prevailed in a jury trial on the § 206(1) claim as well.  SEC v. Westport Cap. Mkts LLC, No. 3:17-CV-02064 (JAM), 2020 WL 6270698, at *10 (D. Conn. Oct. 26, 2020).

[7] Indeed the D.C. Circuit even ruled that the SEC reasonably concluded that "FIAs are more like securities from a risk perspective than other annuity contracts," Am. Equity, 613 F.3d at 176, though the Dodd-Frank Act has since clarified that FIAs may not be regulated as securities.  Pub. L. No. 111-203, § 989J.

conflict of interest, (3) does not provide a form which requires insurance agents to produce "details" relating to their compensation and (4) treats insurance agents as agents of the insurance company, not of the buyer.  D. 22 at 19.  The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  The Advisers Act, which was enacted to regulate the obligations of investment advisers towards their clients, does not specifically relate to the business of insurance.  Thus the key issues are whether the Advisers Act (1) invalidates, impairs or supersedes a state law and (2) whether that state law was enacted for the purposes of regulating the business of insurance.  Defendants' argument fails on the first issue.

The state insurance regulations identified by Defendants would not be invalidated or superseded by Advisers Act, as the Act does not render the cited provisions of state law "ineffective."  Humana Inc. v. Forsyth, 525 U.S. 299, 307 (1999) (defining "invalidate" and "supersede").  No fiduciary duty adheres to Cutter based on his sale of insurance to a customer.  Nor does the Advisers Act require Cutter to use an altered version of the state's insurance sales form or to sever his agency relationship with the insurance company.  Instead, the Advisers Act requires that when Cutter advises clients as to the suitability of annuities as part of their investment strategy, he disclose the fact that his investment advice is conflicted by his role as the insurer's agent.  The Advisers Act protects advisory clients from bad investment advice rather than policyholders from illegal policy provisions or unfair marketing by insurance agents.  See SEC v. Life Partners, Inc., 87 F.3d 536, 541 (D.C. Cir. 1996); SEC v. Nat'l Sec., Inc., 393 U.S. 453, 463 (1969).  At most, the conflict between the Advisers Act and state regulations is indirect.  See id.; Dehoyos v. Allstate Corp., 345 F.3d 290, 297–99 (5th Cir. 2003) (concluding that federal

regulation against discriminatory pricing of life insurance policies did not directly conflict with or impair any state insurance law or policy).

Nor can Defendants show that the Advisers Act "impair[s]" state law.  "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran–Ferguson Act does not preclude its application."  Humana, 525 U.S. at 310; see Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London, 68 F.4th 662, 673 (1st Cir. 2023).  Where the federal law targets a relationship other than that between insurer and policyholder, it typically does not directly conflict with state law.  Compare Nat'l Sec., 393 U.S. at 463 (concluding that only "a most indirect" impairment would result if SEC blocked insurance company merger approved by state insurance officials because SEC's complaint was focused on company's misrepresentation to stockholders regarding the merger, not "a matter predominantly of concern to policyholders alone") and Life Partners, 87 F.3d at 541 (concluding that claim was not precluded where "the relationship that the SEC wants to regulate is that between a promoter and its investors, and regulation of that relationship 'is not insurance regulation, but securities regulation'") (internal citation omitted); with Ludwick v. Harbinger Grp., Inc., 854 F.3d 400, 404–05 (8th Cir. 2017) (concluding plaintiff's RICO claim that insurer misrepresented its financial condition required court to second guess state insurance administrator's determination that insurer was sufficiently stable and solvent and thus was preempted under McCarran-Ferguson).

In this case, the Advisers Act does not even "prohibit[] acts permitted by state law."  Villafañe-Neriz v. FDIC, 75 F.3d 727, 736 (1st Cir. 1996).  Massachusetts law imposes fiduciary obligations on investment advisers which run parallel to the Advisers Act.  950 C.M.R. § 12.205;

see Robinhood Fin. LLC v. Sec'y of Commonwealth, 492 Mass. 696, 700 (2023).  These include

disclosure requirements which explicitly reference the SEC's Form ADV and "any additional

information required to be disclosed under the Investment Advisers Act of 1940," as well as

additional disclosures of fees and disciplinary history.  950 C.M.R. § 12.205(8)(a).  Given the

landscape of Massachusetts regulation, the Court is skeptical that Massachusetts law permits an

individual acting as both an investment adviser and insurance agent to the same group of

customers to avoid disclosing his compensation arrangements.   Thus there is no frustration of

state policy, interference with the state administrative regime or other conflict with state

insurance regulation in the present case, where the federal regulation merely complements the

state regulatory scheme.  See Humana, 525 U.S. at 313 (concluding that Racketeer Influenced

and Corrupt Organizations Act's ("RICO") "private right of action and treble damages

provisions appear to complement Nevada's statutory and common-law claims for relief" against

insurers and thus was not precluded by McCarran Ferguson); Weiss v. First Unum Life Ins. Co.,

482 F.3d 254, 269 (3d Cir. 2007) (concluding that "RICO augments New Jersey's insurance

regime; it does not impair it"); Moore v. Liberty Nat. Life Ins. Co., 267 F.3d 1209, 1222 (11th

Cir. 2001) (concluding McCarran-Ferguson did not preclude application of federal anti-

discrimination law to racial distinctions in life insurance policies where insurer could not identify

"any relevant Alabama authority that has required, condoned, or suggested that racial distinctions

in the provision of life insurance are acceptable").

Accordingly, the Court concludes that SEC's claim is not barred by the McCarran

Ferguson Act.

### 6.    *Whether Defendants Had Fair Notice of Their Disclosure Obligations*

Defendants and Finseca also assert that Defendants could not have known that the

Advisers Act imposed disclosure requirements upon them above and beyond the requirements of

state insurance law.  D. 22 at 24; D. 26 at 10; D. 48 at 24–26.   Defendants cite <u>Upton</u> for the proposition that the SEC must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited."  <u>Upton v. SEC</u>, 75 F.3d 92, 98 (2d Cir. 1996).  In <u>Upton</u>, the SEC argued that a broker-dealer had violated the substance, if not the literal meaning, of a promulgated rule.  <u>Id.</u> at 97–98.  The Second Circuit concluded that there had been "substantial uncertainty" in the SEC's interpretation of the rule, the SEC had been aware of the conduct for two years and otherwise "took no steps to advise the public that it believed the practice was questionable" until after defendant had already stopped the practice.  <u>Id.</u> at 98.

Here, there is no suggestion that the SEC had abstained from enforcement against the sale of FIAs by investment advisers to their advisory clients without proper disclosure.  Indeed the SEC has cited previous instances in which it sought to enforce the Advisers Act against advisers who sold clients insurance products. <u>See</u> <u>Springer</u>, No. 19-cv-02559 (E.D. Cal. filed Dec. 19, 2019); <u>Burroughs</u>, No. 19-cv-01913 (D. Conn. filed Dec. 4, 2019); <u>compare</u> <u>In re Skinner</u>, No. E-2019-0055 (Mass. Off. of the Sec'y of the Cmlth. Dec. 17, 2019).  Even if there had been a failure to enforce in these specific circumstances, advisers' obligation to disclose conflicts of interest to their clients has been clear since at least 1967, when the Supreme Court decided <u>Capital Gains</u>.  <u>Cmlth. Equity Servs.</u>, 2023 WL 2838691, at *9 (rejecting argument that SEC did not provide reasonable notice where it did not adopt rules specifically requiring disclosure of revenue sharing arrangements and quoting <u>Cap. Gains</u>, 375 U.S. at 196).  The practices alleged in the amended complaint, which provide Cutter a financial incentive to recommend clients buy annuities from him rather than investment options which provided Cutter with less compensation, qualify as a material conflict of interest under the Advisers Act.  <u>Cap. Gains</u>, 375 U.S. at 188, 196.  The SEC's characterization of the Form ADV's compensation disclosure

requirements as a "simple and brief disclosure (which is not  required to include the amount or range of the fees)"  does not negate that the Form "requires an adviser that receives compensation attributable to the sale of a security or other investment product (e.g., brokerage commissions), or whose personnel receive such compensation, to disclose this practice and the conflict of interest it creates, and to describe how the adviser addresses this conflict."  75 Fed. Reg. 49238.

Accordingly the Court concludes that the Defendants had sufficient notice of their conflict under disclosure obligations under the Advisers Act and that permitting the SEC's enforcement action would not violate due process.

**C.     Whether the SEC States a Claim Under § 206(4) of the Advisers Act**

Defendants argue that the § 206(4) claim fails because it "merely reiterates the flawed position that Defendants should have disclosed more details about insurance compensation."  D. 22 at 27.  In light of this Court's conclusion the SEC has plausibly pled the inadequacy of Defendants' disclosures, the Court will not dismiss the § 206(4) claim on this basis.  See Cmlth. Equity Servs., 2023 WL 2838691, at *14–15 (granting summary judgment in favor of SEC on claims under §§ 206(2) and 206(4)).

In their reply brief, Defendants argue that the SEC improperly relies on a *res ipsa loquitur* theory, in other words that it is inadequate for the SEC to allege "that a failure of policies and procedures must have occurred because of the other violations that the SEC alleged."  D. 26 at 16.  The only case law Defendants cite in support of their position is a case involving a fraud claim under the Securities Act, wherein a putative class unsuccessfully argued that a chief executive officer must have known his company's internal controls were deficient because a vice president was able to embezzle more than $30 million.  Puskala v. Koss Corp., 799 F. Supp. 2d 941, 950 (E.D. Wis. 2011).  Here, the SEC has specifically alleged that Cutter,

as owner and operator of CFG, understood the conflict of interest created by his receipt of up-front annuity commissions, yet failed to enact any policies to address them.  D. 15 ¶ 112. The SEC acknowledges that a "compliance manual" existed but alleges that the manual makes no reference to the "conflicts of interest inherent in the sales of annuities to advisory clients."  Id. ¶ 111.  Such allegations are sufficient to state a claim under § 206(4) on a motion to dismiss. Cmlth. Equity Servs., 2023 WL 2838691, at *15 (granting summary judgment to the SEC as to § 206(4) claim where record showed the "absence of any policy in place to identify and disclose conflicts of interest caused by receipt of third-party compensation" and where adviser "failed to implement its written policy to disclose the compensation").[8]

Accordingly, the Court denies the motion to dismiss with respect to the § 206(4) claim.

### D.      Whether Statute of Limitations Bars SEC's Securities Fraud Claims

#### a)      Whether the Statute of Limitations in 28 U.S.C. § 2462 Applies

Defendants assert that "Clients A through G sold securities to purchase annuities in 2014–2016" and that any claim under §§ 206(2) and 206(4) regarding those securities sales would have expired under 28 U.S.C. § 2462.  D. 22 at 25.  Under 28 U.S.C. § 2462, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  This statute of limitations applies to SEC enforcement actions under the Advisers Act seeking penalties, such as disgorgement.  Kokesh v. SEC, 581 U.S. 455, 463–65 (2017).[9]  The SEC argues that Defendants "confuse[] *causes of action* with available *remedies*"

---

[8] Defendants also argue that this claim is barred by the statute of limitations and could not apply to conduct prior to October 2017.  See D. 22 at 27.  This Court addresses Defendants' argument regarding such conduct at pp. 25-29, infra.

[9] After Kokesh, Congress established a ten-year statute of limitations for disgorgement actions for claims brought under § 206(1) of the Advisers Act.  15 U.S.C. § 78u(a)(8)(A)(ii)(III); SEC v.

and that "even if there were a five year statute of limitations relevant to causes of action under Sections 206(2) and 206(4), the Complaint has alleged that Cutter's fraud began more than five years ago and *continued* through at least 2022." D. 23 at 13–14 (emphasis in original).

Assuming *arguendo* that all the relief sought in the present case constitutes a penalty within the meaning of § 2462, the limitations period began on March 17, 2018, five years prior to the commencement of this action. See 28 U.S.C. § 2462. The parties agree that some of the alleged misconduct took place outside that time period. D. 22 at 25; D. 23 at 13. Clients A through G each began their advisory relationship with Defendants, were advised to invest a third of their assets in FIAs and purchased FIAs from Cutter prior to March 2018. D. 15 ¶¶ 47–51, 59–63, 73–76, 82–85, 93–94, 100–103. The SEC, however, has also alleged misconduct by Defendants which occurred after March 17, 2018, including Defendants' advice that Clients A through F replace their existing annuities with FIAs sold by Cutter, which, as alleged by the SEC, were unsuited to the clients' needs, caused the clients to suffer adverse financial consequences and were made without disclosing Cutter's financial interest in selling a new round of annuities. Id. ¶¶ 52–55, 64–68, 77–78, 86–89, 95–96. The parties advance at least three theories for how the statute of limitations should apply in such circumstances.

One possibility advanced by Defendants is that the Court should treat the "entire action" as barred because "'the claim first accrued' . . . no later than the allegedly fraudulent transactions with Client F in 2014." D. 26 at 20. The only case Defendants cite which barred an entire claim on this ground, involved "a single, ongoing act" in violation of the Clean Air Act, Sierra Club v. Okla. Gas & Elec. Co., 816 F.3d 666, 672–73 (10th Cir. 2016) (concluding that claim accrued on first day of the modification of an emissions facility without the permit required by the Clean Air

---

Sharp, 626 F. Supp. 3d 345, 371 (D. Mass. 2022) (concluding that ten-year statute of limitations has retroactive effect).

Act), and provides little guidance in this case, where a course of interrelated conduct has been alleged. This case does not involve "a single indivisible act" that accrued on the first day of any violation, but as alleged, a scheme in which Cutter provided the same unsuitable and conflicted investment advice to each of his advisory clients without fully and fairly disclosing the nature of his conflict. See Birkelbach v. SEC, 751 F.3d 472, 479 (7th Cir. 2014) (rejecting the argument that SEC's claim accrued on the first day of President's failure to supervise employee's activity); SEC v. Place, No. CV 16-4291, 2018 WL 6727998, at *7 (E.D. Pa. Dec. 21, 2018) (noting that "judges in other circuits have not treated similar fraudulent schemes as single violations that date back to their origin" and declining to bar entire claims based on "a fraudulent scheme that began outside the statute of limitations"). Thus the Court concludes that the §§ 206(2) and 206(4) claims here are not barred in their entirety, simply because the alleged fraudulent scheme began prior to March 2018.

Another approach asserted by Defendants treats acts within the limitations period as actionable, but bars acts prior to March 17, 2018. D. 22 at 25; D. 26 at 20. Certainly some courts have taken that approach where the SEC alleges repeated and discrete violations by the same defendants. See, e.g., Place, 2018 WL 6727998, at *7 (concluding that each of brokers' misrepresentations or omissions regarding cost of transitioning client portfolios "would create a separate claim," denying summary judgment against claims that occurred during the limitations period and retaining discretion to decide whether "background evidence" as to time-barred claims is admissible). On a Rule 12(b)(6) motion, however, the Court draws all plausible inferences in favor of the SEC and will only dismiss on an affirmative defense such as the statute of limitations where "the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 114 (1st Cir. 2009).

Lastly, under the continuing violations doctrine, a Court may consider the entire course of conduct so long as some violation occurred during the limitations period and the conduct arises under a continuing fraudulent scheme.   See Birkelbach, 751 F.3d at 479 n.7 (explaining continuing violations doctrine); SEC v. Straub, No. 11 CIV. 9645 (RJS), 2016 WL 5793398, at *20 (S.D.N.Y. Sept. 30, 2016) (explaining that "[t]he effect of the continuing violation doctrine is to allow recovery based on the entire course of conduct, including those acts that fall outside the limitations period, so long as the plaintiff 'allege[s] . . . some non-time-barred acts contributing to the alleged violation'" (quoting Gonzalez v. Hasty, 802 F.3d 212, 220 (2d Cir. 2015)) (alterations in original)).   Governing case law does not appear to foreclose the application of the continuing violations doctrine to § 2462 or to SEC enforcement actions under the Advisers Act.   SEC v. Almagarby, 479 F. Supp. 3d 1266, 1271 (S.D. Fla. 2020) (explaining that Gabelli rejected application of discovery rule to § 2462 and "sheds no light" on continuing violation doctrine); see Kokesh, 581 U.S. at 463–65; Gabelli v. SEC, 568 U.S. 442, 448 (2013); but see Straub, 2016 WL 5793398, at *20 (acknowledging that "the terms of Section 2462 do not appear to categorically preclude application of the continuing violation doctrine," but explaining that "[a]pplication of the continuing violation doctrine to Section 2462 is further called into question, at least in the SEC enforcement context, by the Supreme Court's decision in Gabelli").   Here, the SEC has plausibly alleged a continuing scheme by which Cutter and CFG defrauded multiple advisory clients over the course of several years, not merely a one-time violation.   See SEC v. Strebinger, 114 F. Supp. 3d 1321, 1328 (N.D. Ga. 2015) (concluding that SEC adequately pled a pump-and-dump-scheme which was not time-barred simply because certain individual acts occurred more than five years before initiation of the action); see also SEC v. Fiore, 416 F. Supp. 3d 306, 331 (S.D.N.Y. 2019) (denying motion to dismiss on statute of limitations defense but

recognizing that defendants may reiterate those arguments at summary judgment "with the benefit of a developed factual record").

Accordingly, the Court denies the motion to dismiss the §§ 206(2) and 206(4) claims as time barred.

### E.     Whether Defendants Are Liable for Conduct That Occurred Before CFG Registered as an Investment Adviser

Finally, Defendants assert that because CFG was not a registered investment adviser before October 2017 and Cutter was associated with other registered investment adviser firms prior to October 2017, claims based on conduct predating October 2017 must fail.  D. 22 at 25–26; D. 26 at 16–17.  In support of this contention, Defendants cite regulatory guidance indicating that employees of a registered adviser need not independently register with the SEC.  D. 22 at 26 n.38.   Defendants provided no support for the proposition that by not registering as an investment adviser, CFG was somehow absolved of its duties under the Investment Advisers Act.  See Goldenson v. Steffens, 802 F. Supp. 2d 240, 266–67 (D. Me. 2011) (declining to dismiss breach of fiduciary duty claim against individuals not registered as investment advisers and explaining that whether defendants acted as investment advisers was a factual question).  Similarly, Defendants have not explained why, as a matter of law, Cutter would not be individually liable under the Investment Advisers Act as an employee of another firm, where he is alleged to have personally advised clients to purchase FIAs from him without disclosing a material conflict of interest.

Accordingly, the Court will not grant the motion to dismiss on this basis.

**VI.**     **Conclusion**

For the foregoing reasons, the Court DENIES the motion to dismiss, D. 21.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
