UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:23-cv-10589- DJC |
| CUTTER FINANCIAL GROUP, LLC AND JEFFREY CUTTER, | ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
ON ADVISERS ACT SECTION 206(2) CLAIM
OR IN THE ALTERNATIVE, FOR A NEW TRIAL ON THAT CLAIM**

Ian D. Roffman (BBO# 637564)
*iroffman@nutter.com*
Mark C. Jensen (BBO# 646662)
*mjensen@nutter.com*
Melanie V. Woodward (BBO# 690906)
*mwoodward@nutter.com*
Natalia Pena (Bar. No. 707596)
*nepena@nutter.com*
Nutter McClennen & Fish LLP
Seaport West
155 Seaport Blvd.
Boston, MA 02210-2604
(617) 439-2421 (Roffman)

*Attorneys for Defendants*

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Argument ...................................................................................................................... 4

I.   The SEC Failed to Meet Its Burden of Showing Violations of Section 206(2) ................ 5

    A.   Defendants Did Not Breach Their Duty Of Loyalty
        In Their Disclosures of Potential Conflicts of Interest ........................................ 6

    B.   The SEC Did Not Prove That Defendants Acted Negligently .............................. 10

    C.   The FIA Compensation Amounts Are Not Material as a Matter of Law ............ 12

    D.   The SEC Did Not Prove a "Scheme" Under Section 206(2) ............................... 14

        1.   Alleged Misstatements On FIA Replacement Application Forms .......... 15

        2.   Allegedly Negligent Tax Advice ........................................................... 16

II.  The SEC's Claim About FIA Compensation Disclosure Is
    Beyond the Scope of Section 206(2) and Is Barred by the McCarran-Ferguson Act ....... 18

    A.   The SEC Did Not Make Out a Case of "Bad Investment Advice" ...................... 18

    B.   The McCarran-Ferguson Act Bars The Section 206(2) Claim
        That Is Purely About FIA Sales Compensation Disclosure ................................. 21

III. The SEC Failed To Provide Defendants With
    Fair Notice of its Novel Regulatory Interpretation ........................................................ 23

IV.  Alternatively, the Court Should Grant a New Trial Under Rule 59 ................................ 26

    A.   Customer Testimony Suggesting Harm or
        Unsuitable Advice Should Have Been Excluded .................................................. 26

    B.   Theodore Nickel's Expert Testimony Was Improperly Excluded ....................... 28

    C.   Dr. Lemayian's Proffered Testimony on the
        Performance of FIAs Was Improperly Excluded ................................................. 30

    D.   Redtail Notes Were Improperly Excluded ........................................................... 30

    E.   The Court Improperly Excluded 84-24 Forms ..................................................... 33

    F.   Necessary Jury Instructions Were Not Given ...................................................... 34

G.    The SEC Should Have Been Compelled to Admit That
It Never Issued Guidance That RIAs Were Required to
Disclose the Amount of Insurance Commissions ................................................. 39

Conclusion ......................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Group, Inc.*
   47 F. 3d 47 (2d Cir., 1995)..........................................................................................14

*Acme Propane, Inc. v. Tenexco, Inc.*,
   844 F.2d 1317 (7th Cir. 1988) ....................................................................................9

*Adams v. New England Scaffolding, Inc.*,
   No. CV 13-12629-FDS, 2015 WL 9412518 (D. Mass. Dec. 22, 2015) ......................28

*Am. Equity Life Insurance Co. v. SEC*,
   613 F.3d 166 (D.C. Cir. 2010) ..............................................................................19, 24

*AMAG Pharma., Inc. v. Am. Guarantee and Liab. Ins. Co.*,
   No. 21-cv-10618-LTS, 2022 WL 16950437 (D. Mass. Nov. 15, 2022)......................40

*Anderson v. Edward D. Jones & Co.*,
   No. 2:18-CV-00714-DJC-AC, 2024 WL 4120941 (E.D. Cal., Sept. 9, 2024),
   *appeal docketed*, No. 24-6164 (9th Cir. Oct. 9, 2024)......................................11, 35

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
   187 F. Supp. 3d 217 (D. Mass. 2016) ........................................................................35

*Basic v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................33

*Berman v. Alexander*,
   57 Mass. App. Ct. 181 (2003) ....................................................................................17

*Brennan v. Zafgen, Inc.*
   853 F.3d 606 (1st Cir. 2017) ................................................................................14, 35

*Campbell v. Isolation Techs., Inc.*,
   No. CV 04-40236-FDS, 2005 WL 8176501 (D. Mass. Oct. 19, 2005) ......................40

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)....................................................................................................24

*Corban v. Sarepta Therapeutics, Inc.*,
   868 F.3d 31 (1st Cir. 2017)...................................................................................14, 35

*Crabtree Inv., Inc., v. Aztec Enter., Inc.*,
   483 F. Supp. 211 (M.D. La. 1980) .............................................................................18

*DDRA Cap. Inc. v KPMG LLP*,
    No. 04-0158, 2018 WL 924204 (D.V.I. Feb. 14, 2018) ..........................................................17

*Eckert Cold Storage v. Behl*,
    943 F. Supp. 1230 (E.D. Cal. 1996)..........................................................................................17

*Espedito Realty, LLC v. Nat'l Fire Ins. Co. of Hartford*,
    935 F. Supp. 2d 319 (D. Mass. 2013) .......................................................................................31

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...........................................................................................................23, 36

*Figueroa-Torres v. Toledo-Davila*,
    232 F.3d 270 (1st Cir. 2000) ......................................................................................................4

*FTC v. National Cas. Co.*,
    357 U.S. 560 (1958) (per curiam) ............................................................................................22

*Gabelli v. SEC*,
    568 U.S. 442 (2013).................................................................................................................36

*Garcia v. Sprint PCS Caribe*,
    841 F. Supp. 2d 538 (D.P.R. 2012)..........................................................................................30

*Gomez v. Rivera Rodriguez*,
    344 F.3d 103 (1st Cir. 2003) ..............................................................................................26, 29

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).................................................................................................................26

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ....................................................................................................14

*Hoover v. Hyatt Hotels Corp.*,
    99 F.4th 45 (1st Cir. 2024)........................................................................................................11

*Invest Almaz v. Temple-Inland Forest Products Corp.*,
    243 F.3d 57 (1st Cir. 2001) ........................................................................................................5

*Kassel v. Gannett Co.*,
    875 F.2d 935 (1st Cir. 1989) ....................................................................................................30

*Kravetz v. U.S. Tr. Co.*,
    941 F. Supp. 1295 (D. Mass. 1996) ...........................................................................................9

*Ludwick v. Harbinger Grp., Inc.*,
    854 F.3d 400 (8th Cir. 2017) ....................................................................................................22

*Marchand v. Mercy Medical Ctr.*,
22 F.3d 933 (9th Cir. 1994) ........................................................................40

*Martinez v. United States*
33 F.4th 20 (1st Cir. 2022).........................................................................28

*Oliver v. Black Knight Asset Mgmt.*
812 F. Supp. 2d 2 (D.D.C. 2011) ...............................................................16

*Poulin v. Greer*,
18 F.3d 979 (1st Cir.1994)..........................................................................34

*SEC v. Commonwealth Equity Servs., LLC*,
No. 24-1427, slip op. (1st Cir. Apr. 1, 2025) .............................................12

*SEC v. Cutter Fin. Grp., LLC*,
No. 23-CV-10589-DJC, 2023 WL 8653927 (D. Mass. Dec. 14, 2023) ...............39

*SEC v. Happ*,
392 F.3d 12 (1st Cir. 2004).........................................................................40

*SEC v. Nat'l Sec., Inc.*,
393 U.S. 453 (1969)........................................................................21, 23, 36

*SEC v. Navellier & Assocs., Inc.*,
108 F.4th 19 (1st Cir. 2024)..............................................................5, 10, 33

*SEC v. W. Int'l Sec., Inc.*,
No. 2:22-cv-04119-ODW, 2023 WL 2480732 (C.D. Cal. Mar. 13, 2023).......23, 36

*Steinhilber v. McCarthy*,
26 F. Supp. 2d 265 (D. Mass. 1998) ...........................................................34

*Transamerica Mortgage Advisors, Inc., v. Lewis*,
444 U.S. 11 (1979).......................................................................................16

*TSC Industries v. Northway, Inc.*,
426 U.S. 438 (1976).....................................................................................12

*U.S. v. Soler-Montalvo*,
44 F.4th 1 (1st Cir. 2022)............................................................................28

*United States v. Jones*,
689 F.3d 12 (1st Cir. 2012)..........................................................................28

*United States v. Kaiser*,
609 F.3d 556 (2d Cir. 2010)........................................................................31

*United States v. Smith*,
    804 F.3d 724 (5th Cir. 2015) .......................................................................... 32

*United States v. Trenkler*,
    61 F.3d 45 (1st Cir. 1995) .............................................................................. 28

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ............................................................................... 26

*Vasquez-Valentin v. Santiago-Diaz*,
    459 F.3d 144 (1st Cir. 2006) .......................................................................... 29

*Wang v. Gordon*,
    715 F.2d 1187 (7th Cir. 1983) ....................................................................... 18

*Williams v. Ely*,
    423 Mass 467 (1996) ...................................................................................... 17

**Statutes**

Investment Advisers Act of 1940,
    15 U.S.C. § 80b-1 *et seq.* ................................................................... *passim*

Dodd-Frank Financial Reform Act,
    Pub. L. No. 111-203, § 989J .................................................................... 19, 25

McCarran-Ferguson Act,
    15 U.S.C. § 1011 *et seq.* ................................................................... 3, 4, 21, 36

15 U.S.C. § 77b(b) ................................................................................................ 24

15 U.S.C. § 77q(a) ................................................................................................ 16

15 U.S.C. § 78u(d)(8) ........................................................................................... 36

15 U.S.C. § 78j(b) ................................................................................................. 16

26 U.S.C. § 61 ...................................................................................................... 16

26 U.S.C. § 1001 .................................................................................................. 16

26 U.S.C. § 7203 .................................................................................................. 16

Mass. Gen. Laws ch. 175, 176D ......................................................................... 36

**Other Authorities**

Mass. Code. Regs. 34.00....................................................................................... 22, 36

Mass. Code Regs. 96.00...........................................................................................8, 12, 23, 39

71 Fed. Red. 3138 (Jan. 16, 2009) ...........................................................................24

75 Fed. Reg. 49234 (Aug. 12, 2010).............................................................8, 25, 39

Fed. R. Evid. 401 ........................................................................................................28

Fed. R. Evid. 402 ........................................................................................................28

Fed. R. Evid. 403 ........................................................................................................28

Fed. R. Evid. 702 ........................................................................................................28

Fed. R. Evid. 803 .................................................................................................31, 32

NAIC Model Regulation 275, available at
    https://content.naic.org/sites/default/files/inline-files/MDL-275.pdf .........................12, 22, 36

Proposed Rule 151A, Indexed Annuities and Certain Other Insurance Contracts,
    Rel. Nos. 33-8996, 34-59221 (Jan. 8, 2009), 74 Fed. Reg. 3138 ...........................................19

**<u>Preliminary Statement</u>**

After a seven-day trial, the jury returned a defense verdict that Defendants Cutter

Financial Group LLC ("CFG") or Jeffrey Cutter did not violate Advisers Act Section 206(1),

which bars investment advisers from intentionally or recklessly engaging in a scheme to defraud

clients, and did not violate Advisers Act Section 206(4) and Rule 206(4)-7 thereunder, which

require advisers to adopt and implement written policies and procedures reasonably designed to

prevent violations of the Advisers Act.[1] In light of these verdicts and the evidence presented at

trial, the jury's verdict in favor of the SEC on its Advisers Act Section 206(2) claim should be

set aside as a matter of law.

This is an investment adviser disclosure case. The SEC went to trial "under a theory that

Defendants breached their duty of loyalty, not their duty of care" under Section 206(2). SEC

Trial Br. at 2, ECF No. 138. That is, the SEC did not assert that fixed indexed annuities ("FIAs")

recommended by Defendant were bad products, that they were unsuitable or inappropriate for

any client, or that clients lost money. *Id*.; Tr. 4/22/25 6-270:6–9, 18–19 (SEC Closing); SEC

Mot. in Limine to Exclude Irrelevant Evid. 14, ECF No. 102 (disclosures "made to … clients at

the point of sale or in other communications" is "the central issue in this case"). Notably, the

SEC did not argue that Defendants' conflict-of-interest disclosures relating to FIA sales in Forms

ADV were deficient. SEC Mot. in Limine to Exclude Irrelevant Evid. 13, ECF No. 102 ("the

Commission has not charged Defendants with filing any deficient Forms ADV."). Instead, the

SEC complained, insistently, that Defendants failed additionally to disclose the specific *amounts*

of their insurance commissions. Am. Compl. ¶ 2, ECF No. 15; Tr. 4/22/25 6-272:14–21 (SEC

Closing).

---

[1] 15 U.S.C. §§ 80b-6 (1), (4); 17 C.F.R. 206(4)-7. Statutes and regulations under the Investment Advisers Act of 1940 ("Advisers Act") are cited as Advisers Act sections and rules.

But based on all the evidence presented to the jury, there is no legally sufficient basis for

the jury to have found that Defendants acted negligently in their conflict-of-interest disclosures

relating to selling FIAs. In summary, the undisputed evidence at trial was that:

- Defendants' conflict-of-interest disclosures were consistent with investment advisory industry standards. Tr. 4/22/25 6-62:3–8; 6-71:16–24 (Jarcho). Defendants disclosed that CFG advisory personnel were also licensed insurance professionals who sold insurance products, that they received commissions on those sales, that insurance commissions were separate and apart from advisory fees, and that the insurance compensation created a potential conflict of interest that could incentivize the professionals to sell insurance products. Tr. 4/22/25 6-73:12–6-74:4 (Jarcho).

- The SEC's lead examiner believes that CFG's Form ADV disclosures regarding conflicts of interest were appropriate. Tr. 4/15/25 2-54:1–4 (Prata).

- The SEC's lead examiner confirmed the SEC issued no written guidance to investment advisers advising them to disclose annuity commission amounts or percentages, bonus programs or marketing services. Tr. 4/15/25 2-58:3–22 (Prata).

- The SEC's lead examiner never advised CFG to disclose the specific amount of its FIA commissions and he conceded that Mr. Cutter was willing to do whatever the SEC examiner asked of him. Tr. 4/15/25 2-38: 3-6; 2-57:6–2-58:2 (Prata). And

- Two separate outside compliance consultants (Adviser Assist and Dan Rome) drafted CFG's conflict disclosures, and neither advised it to disclose the amount of its commissions. Tr. 4/18/25 5-230:20–5-231:10; 5-234:6–12; 6-31:24–6-32:6 (Farrington); Tr. 4/18/25 5-216:11–14, 19–25 (Rome).

- The former CFG clients who testified at trial expressed very little interest in receiving more disclosure about Defendants' compensation (or any other topic) at the time of sale. Only one witness, Mr. Larkin, claimed to have asked about Mr. Cutter's compensation—a conversation that Mr. Cutter remembers being about fees paid by Mr. Larkin, not Mr. Cutter's compensation, and that in any event took place nearly 10 years ago. This is insufficient to have alerted Mr. Cutter that it would be negligent not to disclose compensation details to every client.

- The SEC offered no evidence that Mr. Cutter had an economic incentive to favor FIAs over managed accounts. Defendants' expert economist, Dr. Lemayian, analyzed Mr. Cutter's economic incentives and found that his economic incentives favored managed accounts over FIAs. Tr. 4/22/25 6-124:12–23 (Lemayian). The SEC's rebuttal expert, Dr. Becker, offered no contrary opinion about Mr. Cutter's incentives or any independent analysis for the assumptions she

2

substituted for Dr. Lemayian's assumptions. Tr. 4/22/25 6-246:18–21; 6-242:3–6-243:24 (Becker).

Under these facts, no reasonable jury should have found that Defendants acted negligently in their conflict-of-interest disclosures.

In addition, the Court should grant judgment as a matter of law to Defendants on the Section 206(2) claim because the SEC's claim, as presented, was exclusively about the details of insurance compensation disclosure. The Advisers Act does not govern the extent of disclosure required in the sale of an insurance product. And the McCarran-Ferguson Act precludes federal regulation of insurance in the absence of specific statutory authorization, which does not exist here. Finally, the SEC failed to provide fair notice to Defendants of the novel position it has taken in this case: that the details of the amount and timing of non-securities insurance commissions must be disclosed to advisory clients who buy insurance products.

Jointly and alternatively, Defendants request a new trial on the SEC's Section 206(2) claim under Fed. R. Civ. P. 59 for four reasons. First, despite its repeated statements that it was *not* asserting a duty of care claim under Section 206(2), the SEC improperly presented irrelevant and prejudicial evidence suggesting that Defendants' recommendations were not in their clients' best interest because they were allegedly unsuitable or caused customer harm. Second, the unfair prejudice suffered by Defendants because of this misleading and confusing evidence was compounded by the exclusion of Defendants' responsive evidence: the proffered testimony of former president of the National Association of Insurance Commissioners Theodore Nickel that Defendants' FIA recommendations were appropriate for Defendants' clients; the proffered testimony of Dr. Lemayian that the FIAs sold to clients who testified performed well and better than alternatives; and other evidence contradicting the SEC's duty of care contentions. Third, Defendants are entitled to a new trial due to the Court's refusal to give several important jury

instructions that were necessary for the jury to apply the law to the facts of this case, including instructions relating to the receipt of compensation, the statute of limitations, the nature of the client consent requirement under Section 206(2), Defendants' fair notice defense, the scope of the SEC's Section 206(2) claim, and the application of the McCarran-Ferguson Act. Finally, the SEC should have been compelled to admit, and the jury should have heard a binding admission, that the SEC never issued written guidance to the industry calling for the disclosure of insurance commission amounts or other details.

<u>**Argument**</u>

The Court may grant a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the non-moving party. Following a jury verdict, a party may both renew its motion for judgment as a matter of law and may include an alternative or joint request for a new trial. Fed. R. Civ. P. 50(b), 59. In ruling on such a motion, the Court may allow judgment on the verdict, order a new trial or direct the entry of judgment as a matter of law. *Id.*

In a motion for judgment as a matter of law, if the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the Court may (a) resolve the issue against the party; and (b) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. Fed. R. Civ. P. 50(b).

Judgment as a matter of law may be entered when the Court, viewing the evidence and all permissible inferences in favor of the non-moving party, finds that a reasonable jury could not render a verdict for that party. *See Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 273 (1st Cir. 2000) (citation omitted). Where the non-moving party has the burden of proof, there must be "more than a mere scintilla of evidence in its favor" and the non-moving party may not "rely on

conjecture or speculation in support of its position." *Invest Almaz v. Temple-Inland Forest Products Corp.*, 243 F.3d 57, 76 (1st Cir. 2001) (citations and internal quotations omitted). "To the contrary, the evidence offered must make the existence of the fact more probable than its nonexistence." *Id.*

In ruling on a new trial motion, after a jury trial, the court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

## I.    <u>The SEC Failed to Meet Its Burden of Showing Violations of Section 206(2)</u>

Section 206(2) prohibits the negligent breach of the fiduciary duty owed to clients. *See, e.g., SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 38 (1st Cir. 2024). The SEC's 2019 Guidance, though issued over five years after the earliest events in this case, states that the Section 206 fiduciary duty consists of two independent duties: a duty of care and a duty of loyalty. Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Rel. No. IA-5248, 2, 7 (June 5, 2019) ("SEC 2019 Guidance"). Here, the SEC does not advance a duty of care claim. SEC Trial Br. 2, ECF No. 138.

The duty of loyalty includes a duty to "expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously— to render advice which was not disinterested." SEC 2019 Guidance at 23. Whether the disclosure is "full and fair" depends "upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict." *Id.* at 25. In any event, the disclosure "must be clear and detailed enough for the client to make an informed decision to consent to the conflict of interest or reject it." *Id.* at 26.

The concept of "informed consent" described in the 2019 Guidance is unlike, for example, a medical consent, in that it does not require a client signature or other explicit

acceptance by the client. An adviser is not required "to make an affirmative determination" that a client understood the disclosure or that the client's consent was informed. *Id.* at 27. Rather, the disclosure must "put a client in a position to be able to understand" the disclosure. *Id.* The disclosure can be made "through a combination of Form ADV and other disclosure." *Id.* at 27 n.68. The client's consent may be explicit or implicit. *Id.* at 27. A client may implicitly consent to the conflict by "entering into or continuing the investment advisory relationship with the adviser." *Id.* at 27 n.68.

### A.    Defendants Did Not Breach Their Duty of Loyalty In Their Disclosures of Potential Conflicts of Interest

Defendants disclosed their conflict of interest in accordance with industry standards and in accordance with their reasonable understanding of the SEC's requirements. The SEC does not contest the sufficiency of CFG conflict-of-interest disclosures in Forms ADV and CRS, and their examiner, Mr. Prata, testified that he found no fault in them. Tr. 4/15/25 2-54:1–4 (Prata). Defendants' SEC disclosure expert, Ms. Jarcho, confirmed that CFG's Form ADV disclosures since its registration in 2017 were consistent with securities industry standards. Tr. 4/22/25 6-62:3–8; 6-71:16–24 (Jarcho). And CFG's outside compliance consultant, Mr. Rome, confirmed that CFG follows sound practices for periodic review and annual updates of its Form ADV disclosures. Tr. 4/18/25 5-207:9–5-208:21; 5-213:15–5-214:23 (Rome).

To be specific, these documents, filed with the SEC and delivered to customers, expressly disclosed that CFG's insurance professionals received commissions on the sales of FIAs and had a conflict of interest due to that commission income.

> Certain Advisory Persons are also licensed as independent insurance professionals. As an independent insurance professional, the Advisory Person may earn commission-based compensation for selling insurance products, including insurance products they sell to you. Insurance commissions earned by these persons are separate and in addition to our advisory fees. This practice presents a conflict

> of interest because the person providing investment advice on behalf
> of the Advisor who is also an insurance agent has an incentive to
> recommend insurance products to you for the purpose of generating
> commissions rather than solely based on your needs.

Trial Ex. 2-A at 7 (CFG 2017 Form ADV).

> Some of our financial professionals are licensed as insurance agents
> either independently or through Cutterinsure Inc. ("Cutterinsure"),
> an affiliated insurance agency. In addition to our services, your
> financial professional will offer you insurance products in their
> separate capacity as an insurance agent. The fees charged for the
> implementation of insurance products are separate from our
> advisory fees, where your financial professional and/or Cutterinsure
> will earn commission-based compensation for the implementation
> of an insurance product. Therefore, there is a financial incentive to
> recommend that you implement insurance through our financial
> professionals or Cutterinsure.

Trial Ex. 6 (CFG 2020 Form CRS).

In addition, it is undisputed that Cutter provided clients with all insurance company

authorized and required documents, which were signed and acknowledged by each client. Trial

Exs. 100–106, 109, 110, 113–117, 145, 147, 149, 150–152, 174–177, 183, 184, 187, 189, 197,

198, 200, 209, 210, 212, 213B, 214–216, 226–228, 231, 233, 262, 264–266.

The SEC's Instructions for Part 2 of Form ADV do not require RIAs to disclose the

amount or rate of compensation from the sale of non-advisory products, like FIAs. Rather, they

require only that RIAs who receive compensation for non-advisory products "disclose this fact"

and "explain that this practice presents a conflict of interest and gives [the RIA or its] supervised

persons an incentive to recommend investment products based on the compensation received,

rather than on a client's needs." Trial Ex. 22 Item 5.E (Form ADV Part 2 Instructions). This is

*exactly* what CFG did: it disclosed the fact of the conflict and explained that the "practice

presents a conflict of interest because the person providing investment advice on behalf of the

Advisor who is also an insurance agent has an incentive to recommend insurance products to

[clients] for the purpose of generating commissions rather than solely based on [client] needs." Trial Ex. 2-A at 7 (CFG 2017 Form ADV). The SEC has not issued any other guidance requiring more specific disclosures of commission amounts. Tr. 4/15/25 2-58:3–22 (Prata); Pl.'s Supp. Resp. 2, ECF No. 81-1.

Massachusetts insurance regulations require disclosure of the *fact* of compensation but not the *amount*, unless the consumer requests it, and Massachusetts uses a disclosure form that does not include the amount or timing of the commission.[2]

The SEC's limited requirements for non-securities compensation disclosure is in stark contrast to its instructions about securities advice. RIAs must disclose the *amount* of compensation for *advisory* services in their "fee schedules." Trial Ex. 22 Item 5.A. (Form ADV Part 2 Instructions). When the SEC instructs RIAs to disclose the *amount* of *advisory* fees (Item 5.A), but only the *fact* of *non-advisory* fees (Item 5.E), the only reasonable interpretation is that RIAs are *not* required to disclose the *amount* of non-advisory fees. The SEC confirmed this in its adopting release for Form ADV amendments. The agency asked RIAs to make "simple and brief" disclosures of compensation for non-advisory services that are "*not required to include the amount or range of the fees*…." Amendments to Form ADV, 75 Fed. Reg. 49234, 49238 (Aug. 12, 2010) (emphasis added).

Given that Defendants' ADV forms were fully compliant with SEC standards, the SEC falls back on an argument that the amount and timing of commissions should have been disclosed to clients in a one-on-one setting. But Mr. Cutter's former clients showed little if any interest in the subject. None recalled reading the ADV form. Ms. Thompson did not recall any conversation but assumed there would be a fee. Tr. 4/15/25 2-112:16–19 (Thompson). Mr.

---

[2] 211 Mass. Code Regs. 96.05(1)(b). Massachusetts' current form is available at https://www.mass.gov/doc/producer-disclosure-for-annuities/download.

McGuire appeared to assume that the advisory fee rate applied "for everything." Tr. 4/15/25 2-167:22–2-168:4 (McGuire). Mr. Hanson and Ms. Webber did not ask. Tr. 4/16/25 3-37:14–18 (Hanson); Tr. 4/17/25 107:12–17 (Webber). Ms. Ridenour recalled being told that the insurance companies pay the commissions and did not ask the amount. Tr. 4/17/25 55:4–11 (Ridenour). Similarly, Ms. Doiron testified that she assumed there was a commission and that the fact that Mr. Cutter was being compensated for insurance sales didn't bother her. Tr. 4/16/25 3-81:17–3-82:15 (Doiron). Indeed, of all the clients contacted by the SEC, only one even remembers asking Mr. Cutter about his compensation, Tr. 4/14/25 104:11–15 (SEC Opening), and that conversation took place nearly 10 years ago, outside the statute of limitations for Section 206(2). Tr. 4/16/25 3-98:1–2; 3-100:14-17 (Larkin). Mr. Cutter's clear recollection is that Mr. Larkin's question was about the fees to be paid by Mr. Larkin rather than the commissions paid by the insurance company which did not affect Mr. Larkin's contract value. Tr. 4/18/25 5-53:22–5-54:17 (Jeffrey Cutter). And Mr. Larkin's testimony corroborates that his concern was about fees, not commissions. Tr. 4/16/25 3-100:14-17 (Larkin). This evidence simply does not support a claim that Mr. Cutter had a fiduciary duty to disclose commission amounts.

Moreover, having disclosed the conflict of interest to their clients in writing, Defendants cannot be held liable for failing to disclose. An investment adviser is not required to ensure that its clients read all the information provided to them. SEC 2019 Guidance at 27 (adviser has no duty to affirmative determine if clients read or understand disclosures); *see also Kravetz v. U.S. Tr. Co.*, 941 F. Supp. 1295, 1309 (D. Mass. 1996) (when alleged omissions were "fully disclosed, in writing, and often in bold print," investors' decisions "not to read these documents does not constitute fraudulent concealment on the part of the [investment advisers]"); *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir. 1988) ("Just as in the law of

contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement.").

### B.    The SEC Did Not Prove that Defendants Acted Negligently

The SEC has the burden of showing that Defendants acted negligently to establish a violation of Section 206(2). An adviser acts "negligently" if he fails to use reasonable care under the circumstances, which is the degree of care that a reasonably careful person would use under those circumstances. *Navellier & Assoc.,* 108 F.4th at 39.

Even if Defendants' conflict-of-interest disclosures had failed to meet Advisers Act standards, which they did not, the SEC failed to present evidence sufficient to support a verdict that Defendants acted negligently. Unrebutted trial testimony showed that Defendants acted in accordance with industry practices in making conflict-of-interest disclosures to clients. Tr. 4/22/25 6-62:3–8; 6-71:16–24 (Jarcho). The SEC's examiner, Mr. Prata, found no fault with Defendants' Form ADV disclosures, did not ask them to make additional disclosures, and knew of no SEC guidance to the effect that additional insurance compensation details needed to be disclosed. Tr. 4/15/25 2-54:1–4; 2-57:6–2-58:2; 2-58:3–22 (Prata).

And, as explained above, the SEC has never published written guidance that additional details were required to be disclosed, and the NAIC-based Massachusetts insurance regulation does not require them. Based on the most detailed and pertinent regulatory guidance available, that from insurance regulations, there was no evidence presented to support the SEC's argument that Defendants failed to use the degree of care that a reasonably careful person would use under those circumstances in determining that no other details related to compensation were needed.

It was also reasonable for Defendants to conclude, as discussed below, that the compensation details now demanded by the SEC were not material. Defendants did not in fact

10

have an economic incentive to favor FIAs over managed accounts and did not come close to

"maximizing" their revenues from FIAs. The SEC has also acknowledged in public guidance that

differential compensation does not establish breach of duty where the recommendation was

otherwise suitable, which in this case the SEC does not contest.

> When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy .... Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives.

IAA Rel. 5248, at 33674.[3]

Finally, the jury's verdict of no liability under Section 206(4) and Rule 206(4)-7 further

supports a finding as a matter of law that Defendants did not act negligently in their disclosure

practices. Industry standard policies and procedures can be considered as evidence of negligence

"or the lack thereof." *Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 62 (1st Cir. 2024). Here the jury

found that CFG did **not** "fail[ ] to adopt and *implement* written policies and procedures

*reasonably designed* to prevent violations of the Advisers Act and rules . . ." ECF No. 170 at 2

(emphasis added). This conclusion required two findings: that CFG's procedures were

reasonably designed to prevent violations of the Advisers Act *and* that CFG implemented these

procedures reasonably. Thus, in the jury's view, CFG compliance practices, *as implemented*,

were reasonable.

---

[3] *See also Anderson v. Edward D. Jones & Co.,* No. 2:18-CV-00714-DJC-AC, 2024 WL 4120941, at *13 (E.D. Cal., Sept. 9, 2024), *appeal docketed*, No. 24-6164 (9th Cir. Oct. 9, 2024) ("The mere fact that Defendant recommended customers to open advisory accounts and that Defendant increased revenue by providing these additional services does not, standing alone, support an inference that Defendant made those recommendations without a reasonable belief that the accounts were in the clients' best interests, especially in the face of contrary evidence as discussed above.").

### C.    The FIA Compensation Amounts Are Not Material as a Matter of Law

In an omissions case, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449 (1976). This standard applies to SEC enforcement actions under Section 206(2). *SEC v. Commonwealth Equity Servs., LLC*, No. 24-1427, slip op. at 31 (1st Cir. Apr. 1, 2025). Applying this standard to an SEC conflict-of-interest omission claim, the issue is whether a reasonable investor would have viewed "additional disclosures with more precise descriptions, added to the already-disclosed conflicts of interest" as having "significantly altered the total mix of information made available." *Id.* at 35 (internal quotations omitted). The governing reasonable investor standard is an <u>objective</u> standard, not a subjective one. *TSC Industries*, 426 U.S. at 445.

In the absence of specific SEC guidance about insurance compensation disclosures, it is reasonable to look for other regulatory guidance. Massachusetts regulations, and the NAIC rule adopted in almost every state, provide that agent compensation is not a "material conflict of interest."[4] The third-party insurance professionals who testified explained why. Commissions are paid to Mr. Cutter by the insurance companies and are not deducted from the customer's contract value. Tr. 4/15/25 2-76:20–23 (Milligan) (reading from Trial Ex. 51); Tr. 4/16/25 3-154:6–23 (Van Cleave). Commission amounts were standard and set by the insurance companies. Tr. 4/16/25 3-25:20 – 3-26:2 (Donahue). And Mr. Cutter used application and disclosures forms provided by the insurance companies. Tr. 4/16/25 3-20:16–3-21:14 (Donahue).

---

[4] 211 Mass. Code Regs. 96.04; *see* NAIC Model Rule 275, Sec. 5.I.(2); Model Regulation #275 Frequently Asked Questions, Q10 (Conflict of Interest Obligation), NAIC (July 2021) https://content.naic.org/sites/default/files/inline-files/Final%20FAQ%20July%202021.pdf.

In addition, Mr. Cutter also did not have an *ex ante* incentive to recommend FIAs over managed accounts, and did not in fact come close to "maximizing" his compensation as alleged by the SEC. Dr. Lemayian's study showed that at the time recommendations were made, Defendants could reasonably expect that the present value of fees on investment advisory assets would exceed the commissions from FIAs. Tr. 4/22/25 6-124:12–23 (Lemayian). Defendants' incentive to favor investment advisory assets grew after 2017, when Mr. Cutter registered CFG as an independent investment adviser. Tr. 4/22/25 6-127:16–25 (Lemayian). In short, the amount and timing of FIA commissions did not create an incentive for Defendants to favor them over managed accounts and, accordingly was not material as a matter of proper economic analysis.

The SEC offered no independent analysis of whether Mr. Cutter had an incentive to favor FIAs over managed accounts at the time of sale. Tr. 4/15/25 2-60:23–2-61:2 (Prata); Tr. 4/22/25 6-246:18–21 (Becker). That is, the SEC presented no evidence to establish the assumption underlying its entire case: that Mr. Cutter has an incentive to favor FIAs over managed accounts. Am. Compl. ¶ 37, ECF No. 15. The most it could muster was a rebuttal witness who took no issue with Dr. Lemayian's methodology and offered no independent opinions regarding many of the assumptions she purported to criticize. Tr. 4/22/25 6-242:3–6-243:24 (Becker). Moreover, Dr. Becker confirmed that Mr. Cutter had a strong incentive to retain managed account clients as long as possible. Tr. 4/22/25 6-212:8–9; 6-242:3–12 (Becker). In short, Dr. Becker's testimony did not establish that Mr. Cutter had any incentive to favor FIAs.

The SEC fell even further short of proving that Mr. Cutter "maximized" his compensation as alleged. The evidence showed that only about 54% of Defendants' advisory clients had FIAs. Tr. 4/15/25 2-39:12–15 (Prata). As to replacements, Mr. Cutter's replacement

rate of 7% of Cutter-sold annuities (and under 13% of all annuities) was far below the industry average range of 30-50% noted by Mr. Milligan of Athene. Tr. 4/15/25 2-99:16–20 (Milligan).

Finally, it is undisputed that Mr. Cutter received no more than industry standard compensation from insurance companies—indeed, compensation set by the insurance companies themselves. Tr. 4/16/25 3-25:20–3-26:2 (Donahue). Courts have been reluctant to make inferences from the receipt of industry standard forms of compensation, which is, in effect, expected and not in itself material:

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."

*Acito v. IMCERA Group, Inc.* 47 F.3d 47, 54 (2d Cir. 1995) (citations omitted).[5]

Accordingly, the SEC did not meet its burden of showing that the other compensation details it now demands, in the context of clear written disclosure of the commission-based compensation, would have been material to a reasonable investor.

**D.    The SEC Did Not Prove a "Scheme" Under Section 206(2)**

The SEC also put forward several client-specific claims, seemingly in an attempt to support its claim that Defendants engaged in a "scheme." In any event, by rejecting the SEC's Section 206(1) claim, the jury put to rest any suggestion that Defendants engaged in a "device, scheme or artifice" to defraud. *Compare* Section 206(1) ("device, scheme or artifice to defraud")

---

[5] The First Circuit has often discounted similar allegations. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999) ("[C]atch-all allegations that defendants stood to benefit from wrongdoing ... are [not] sufficient"); *Brennan v. Zafgen, Inc.* 853 F.3d 606, 615 (1st Cir. 2017) (rejecting scienter allegation based on executive compensation incentives, including "performance-based cash bonuses," which are common industry practices); *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 41 (1st Cir. 2017) ("'[T]he usual concern by executives to improve financial results' does not support an inference of scienter.")

*with* Section 206(2) ("transaction, practice or course of business which operates as a fraud or deceit"). Moreover, the evidence does not support the SEC's additional factual claims.

           1.      <u>Alleged Misstatements on FIA Replacement Application Forms</u>

The SEC presented evidence purporting to show that Defendants made a handful of alleged misrepresentations to insurance companies in replacement applications submitted to those insurance companies. These statements all involve, in one way or another, the clients' *future* income needs. These alleged misrepresentations to insurance companies are not a basis for a Section 206(2) verdict for three reasons.

First, the SEC did not show that the statements did not correctly reflect the information available to Mr. Cutter. Ms. Thompson and Mr. McGuire had no meaningful recollections of their conversations with Mr. Cutter about the replacements, and thus there is no reason to question the statements made in the application forms. Tr. 4/15/25 2-127:23–2-128:22 (Thompson); 2-189:7–18 (McGuire). Ms. Doiron's testimony that she and her husband had never needed income is completely consistent with the point that they did not need an income feature going forward.

Second, the statements have not been shown to be misleading to their intended audience, the insurance companies. These statements—all signed by the clients themselves—addressed whether each client had any future need for the income *features* of their prior annuities, not whether they might in general benefit from having additional income from an unspecified source, or whether they had needed the income features at the time of their initial annuity purchase. The insurance company issuing the replacement FIA is obviously not concerned with the suitability of a prior purchase of an FIA from a different issuer, only whether the replacement is suitable, including whether customer might be giving up an annuity feature that he or she plans to use. The statements at issue therefore were not misleading to their intended audience, the replacement

annuity issuer. Indeed, both insurance company representatives testified that their analysis of the suitability of replacement applications is "holistic," and that no one factor would be dispositive of their analysis of the suitability of the proposed transaction. Tr. 4/16/25 3-159:12–3-160:4 (Van Cleave); Tr. 4/15/25 2-96:17–2-97:5 (Milligan). The SEC presented no evidence at all that the alleged misrepresentations, or any other statement, actually influenced the suitability review of any FIA application by any insurance company.

Third, even if they had been misleading, these representations are not actionable under Section 206(2) because they do not involve fraud or deceit upon clients or prospective clients (especially in the absence of a suitability claim). Section 206(2) requires that the claimed fraud or deceit be upon <u>clients or prospective clients</u>. 15 U.S.C. § 80b-6. "It is apparent that the two sections [Advisers Act §§ 206 and 215] were intended to benefit the clients of investment advisers…." *Transamerica Mortgage Advisors, Inc., v. Lewis,* 444 U.S. 11, 17 (1979); *see also Oliver v. Black Knight Asset Mgmt.* 812 F. Supp. 2d 2, 13 (D.D.C. 2011).[6]

### 2. Allegedly Negligent Tax Advice

The SEC has not proven misconduct of any kind with respect to client capital gains taxes. Capital gains taxes are part of the federal income tax regime and are not tax "penalties" as the SEC alleges. Am. Compl. ¶ 106, ECF No. 15; *compare* 26 U.S.C. § 61, 1001 (including capital gains in income calculation) with 26 U.S.C. § 7203 (penalty for willful failure to file return or pay tax). Moreover, capital gains taxes are paid to the government, not the investment adviser, and so do not raise the duty of loyalty issues that the receipt of compensation does. Put another way, any claim about capital gains taxes is inherently a question about the suitability of overall

---

[6] Compare the Section 206(2) requirement that any fraud or deceit must be *upon a client or prospective client* with the parallel provisions in Section 17(a) of the Securities Act of 1033 and Section 10(b) of the Securities Exchange Act of 1934, which do not specify any particular victim.
.

investment recommendation for the customer under the duty of care. Here, the SEC has disclaimed any duty of care claim. In addition, it has not begun to offer meaningful evidence to support a claim that Defendants provided even negligent tax advice.

In the context of investments, a claim of merely negligent tax advice would require showings that:

- The clients incurred taxes they would not have otherwise been required to pay. *Williams v. Ely*, 423 Mass 467, 476 (1996); *see Eckert Cold Storage v. Behl*, 943 F. Supp. 1230, 1234 (E.D. Cal. 1996); *and*

- The clients *would* have chosen alternative available investments, considering both tax and investment risk characteristics. *Berman v. Alexander*, 57 Mass. App. Ct. 181, 188 (2003) (contrasting professional's recommendations of "sure and significant gains" with "the high risk, confrontational gambit" later proposed by the client). Professionals are not required to "secure the optimum outcomes for their clients . . ." *Id.* at 187; *and*

- The advice fell short of the standard of care, based on expert testimony. *Eckert Cold Storage*, 943 F. Supp. at 1235 n.8; *DDRA Cap. Inc. v KPMG LLP,* No. 04-0158, 2018 WL 924204, at *4 (D.V.I. Feb. 14, 2018).

The SEC has not presented evidence supporting any of these three points.

The SEC initially asserted tax-advice claims concerning only 3 clients out of over 500, and each of these three is quite different—not evidence of a "scheme" of any kind. Mr. Larkin understood the tax implications of his 2015 securities sales beforehand and stood by while Cutter executed the trades. *See* Tr. 4/16/25 3-114:16–18 (Larkin); Trial Ex. 267 (Email from Jeffrey Cutter to Michael Larkin, re: Capital Gains, April 19, 2015); Tr. 4/18/25 5-54:18–5-55:3; 5-56:17–5-57:3 (Jeffrey Cutter). And his situation is outside the five-year statute of limitations applicable to Section 206(2).

Ms. Ridenour did not sell securities to buy a FIA—she used a tax-free 1035 exchange to buy her FIA. Her *securities* sales enabled her to switch into CFG's *securities* strategy, and the merits of this recommendation would require an expert evaluation of the prudence of the

comparative investment and tax options which the SEC has of course not offered.[7] In addition, Ms. Ridenour changed her testimony between her deposition and trial concerning what was discussed in her initial meetings with Mr. Cutter, Tr. 4/17/25 42:14–23; 43:22–44:21 (Ridenour); after receiving her tax bill, she does not recall whether she wrote or called Mr. Cutter. Tr. 4/17/25 37:9–24 (Ridenour). Mr. Cutter does not recall such a conversation, and Ms. Farrington, not Mr. Cutter, was her primary CFG adviser at that time. Tr. 4/18/25 5-23:8–19 (Jeffrey Cutter). Finally, after she filed her tax returns in 2022, she remained a client of CFG and signed a new investment management agreement with CFG in November 2022.

The SEC presented no evidence at all in support of the claim in its Amended Complaint about taxes allegedly incurred by Ms. Thompson. *See* Am. Compl. ¶ 50, ECF No. 15.

## II.    The SEC's Claim About FIA Compensation Disclosure Is Beyond the Scope of Section 206(2) and Is Barred by the McCarran-Ferguson Act

### A.    The SEC Did Not Make Out a Case of "Bad Investment Advice"

Section 206(2) applies to registered investment advisers, persons who engage in the business of providing advice "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," as the Advisers Act definition requires. 15 U.S.C. § 80b-2(a)(11). Advice about non-securities assets is, therefore, not actionable under Section 206(2). *Wang v. Gordon*, 715 F.2d 1187, 1189, 1192 (7th Cir. 1983) (advice about sale of apartment building, not securities); *Crabtree Inv., Inc., v. Aztec Enter., Inc.*, 483 F. Supp. 211, 214 (M.D. La. 1980) (claim about guaranteed contract, not a security). It is not disputed that FIAs are

---

[7] The SEC only presented Dr. Becker as a rebuttal expert to Dr. Lemayian's report about Mr. Cutter's economic incentives. She did not opine on tax issues.

insurance contracts, not securities, Tr. 4/15/25 2-39:12–15 (Prata), which is true as a matter of law.[8]

The SEC specifically lacks authority to regulate FIAs, having been rebuffed in its prior rulemaking effort, *Am. Equity Life Insurance Co. v. SEC*, 613 F.3d 166, 177-79 (D.C. Cir. 2010) (vacating Securities Act Rule 151A; *see* section III, *infra*), even before the Dodd-Frank Act clarified that FIAs are not securities.

This Court's Order on Defendants' motion to dismiss described the respective roles of the Advisers Act and insurance regulations.

> [T]he Advisers Act requires that when Cutter advises clients as to the suitability of annuities as part of their investment strategy, he disclose the fact that his investment adviser is conflicted by his role as the insurer's agent. <u>The Advisers Act protects advisory clients from bad investment advice rather than policyholders from illegal policy provisions or unfair marketing by insurance agents.</u>

Mem. And Order 20, ECF No. 58 (emphasis added; citations omitted).

The SEC has not made out a claim of "bad investment advice" with respect to the FIAs (or any other asset). The SEC stated in response to more than a dozen Requests for Admission that it "has not alleged that any of the insurance annuity products sold by Mr. Cutter were unsuitable" and the SEC is taking "no position" on the unsuitability of the FIAs. Pl. Resp. to Req. for Admins., Nos. 16-35, ECF No. 117-02; *see* SEC Trial Br. 2, ECF No. 138 (no claim of breach of duty of care). Indeed, it is undisputed that FIAs have guarantees against declines due to market risk. 4/15/25 2-92:25–2-93:7 (Milligan). Mr. Donahue of the insurance intermediary firm DMI testified that both Athene and Nationwide were highly rated life insurance and annuity

---

[8] *See* Pub. L. No. 111-203, § 989J (provision of Dodd-Frank Act expressly exempted FIAs from SEC regulation); Memorandum and Order, Dec. 14, 2023, ECF No. 58 ("Order") at 14 (quoting SEC brief statement that "the allegations of the complaint and the application of the Advisers Act are *not* premised on the notion that the annuities Cutter sold his advisory clients are securities") (emphasis in original).

issuers and had no adverse comments about Allianz. 4/16/25 3-18:8–14, 3-18:24–3-19:4 (McCann).

Notably, the SEC has not pursued or developed the type of claim credited by the Court on the motion to dismiss, i.e., that Defendants' recommendations regarding the allocation of assets between FIAs and securities was unsuitable.[9] To be specific, the SEC did not make an asset allocation claim either with respect to recommendations at the time of a client's initial FIA purchase or at the time of a replacement transaction.[10]

In the absence of any claim of bad investment advice, the SEC's remaining claim, that Defendants should have disclosed more detail about their *insurance* compensation, is a claim of "unfair marketing by insurance agents" in the Court's phrase. As the SEC does not contend that Defendants' written conflict of interest disclosures in Form ADV, filed with the SEC and delivered to clients, were insufficient, the specific additional details that the SEC claims were omitted have only to do with FIAs: compensation amounts, timing and additional benefits received directly or indirectly from insurance companies.

The SEC's framing of this claim as a "long-running, multi-faceted fraud scheme . . . designed to maximize the money and services flowing to [Defendants]," SEC Trial Br. 4, ECF No. 138, does not change this analysis: it is still a claim about insurance sales practices and the details of insurance compensation that is unconnected to any claim that the FIAs were unsuitable under any standard. Defendants were entitled to be compensated for providing sound advice.

---

[9] Mem. And Order 15, ECF No. 58 ("The violation of the Advisers Act in this case arises not from the fact that Defendants sold annuities, but rather that Defendants recommended that advisory clients spend a third of their total assets buying FIAs from Cutter without fully and fairly disclosing Cutter's alleged conflict of interest.").

[10] As noted below, the replacement transactions involve neither securities nor asset allocation, and plainly do not involve advice "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," as the Advisers Act definition requires. 15 U.S.C. § 80b-2(a)(11).

The SEC argued that proper Form ADV disclosure is not enough: they say that these compensation details needed to be disclosed outside the Form ADV to any individual clients who might be interested. This is disingenuous. The SEC itself does not even require that an RIA "to make an affirmative determination" that a client understands the disclosures, much less that the RIA anticipate every detail that might interest a client. SEC 2019 Guidance at 27. If the Court were to accept the SEC's novel theory in this litigation, RIAs would have no way to protect themselves against a similar SEC lawsuit without systematically making these disclosures. The SEC's claim can only be seen as an attempt to regulate insurance sales practices, which is beyond the scope of Section 206(2).

### B. The McCarran-Ferguson Act Bars the Section 206(2) Claim That Is Purely About FIA Sales Compensation Disclosure

The McCarran-Ferguson Act gives state insurance law pre-emptive force in the absence of specific federal legislation and should preclude the SEC from using the Advisers Act to regulate the marketing and sale of insurance products, including FIAs. As this Court previously held:

> The McCarran-Ferguson Act provides that '[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 USC § 1012(b). The Advisers Act, which was enacted to regulate the obligations of investment advisers towards their clients, does not specifically relate to the business of insurance.

Mem. and Order 20, ECF No. 58.

The Supreme Court has held that state insurance law governs "selling and advertising of policies," "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," and anything "directly or indirectly" relating to the "relationship between the insurance company and the policyholder." *SEC v. Nat'l*

*Sec., Inc*., 393 U.S. 453, 458-61 (1969); *see also FTC v. National Cas. Co.*, 357 U.S. 560, 562-63 (1958) (per curiam) (noting that McCarran Ferguson "withdrew" federal authority to regulate insurance companies' advertising practices); *Ludwick v. Harbinger Grp., Inc.*, 854 F.3d 400, 403 (8th Cir. 2017) (McCarran-Ferguson preempts claim of misleading annuity marketing materials).

As noted above, there is no dispute that FIAs are insurance contracts, and not securities. This Court has acknowledged that there are state insurance regulations governing the sale and replacement of FIAs. Mem. and Order 19-20, ECF No. 58. Among those regulations are annuity suitability and annuity replacement regulations. 211 Mass. Code Regs. 34.01 et seq. (based on NAIC Life Insurance and Annuities Replacement Model Regulation Model Rule 613) and 96.01 et seq. (based on NAIC Suitability in Annuity Transactions Model Regulation 275). The Court's Order explained its views of the roles of the Advisers Act and insurance regulations.

> The Advisers Act protects advisory clients from bad investment advice rather than policyholders from illegal policy provisions or unfair marketing by insurance agents.

Mem. and Order 20, ECF No. 58.

The SEC's Section 206(2) count boils down to a claim that Mr. Cutter should have made additional disclosures about FIAs, above and beyond the unchallenged written disclosures in CFG's Form ADV, to each client individually. This can be seen only as an attempt to regulate "the relationship between the insurance company and the insured." The SEC's claim that compensation details were material facts—besides being economically incorrect[11]—is in direct contradiction with applicable insurance regulations, adopted in Massachusetts and almost uniformly across the country. "Material conflict of interest does not include cash compensation

---

[11] *See supra* Section I.C., regarding economic incentives.

or non-cash compensation." Mass. Code Regs 96.04 (definition, Material Conflict of Interest); NAIC Model Reg. 275.

FIA to FIA replacement transactions involve only insurance products that are not securities. The SEC claim that these replacements involved deceitful sales practices crosses far over the Supreme Court's line of inappropriate federal intervention in the "selling and advertising of policies," "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," and anything "directly or indirectly" relating to the "relationship between the insurance company and the policyholder." *Nat'l Sec., Inc.*, 393 U.S. at 458-61. Or to use this Court's synopsis, such allegations involve "unfair marketing by insurance agents" rather than "bad investment advice." Mem. and Order 20, ECF No. 58.

### III.    The SEC Failed to Provide Defendants With Fair Notice of its Novel Regulatory Interpretation

The SEC's Section 206(2) claim is that Defendants, after having made compliant conflict-of-interest disclosures in Form ADV, were obligated to go further and disclose *certain details of that compensation*. This level of detail goes beyond any guidance, much less notice-and-comment rulemaking, issued by the SEC. It would be unlawful for the SEC to apply this novel regulatory interpretation to Defendants without notice.

The fair notice defense asks whether the law in question "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited, or [was] so standardless that it authorize[d] or encourage[d] seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012); *SEC v. W. Int'l Sec., Inc.*, No. 2:22-cv-04119-ODW, 2023 WL 2480732, *5-7 (C.D. Cal. Mar. 13, 2023). In the enforcement context, it is "unfair surprise" to "require regulated parties to divine the agency's interpretations in advance or else be held liable

when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 157-58 (2012).

In light of the public history regarding the SEC's failed effort to regulate FIAs, Mr. Cutter (and the entire insurance industry) could not have been expected to anticipate that the SEC would assert the specific FIA disclosure demands that it has in this case. No formal SEC regulation of FIAs has ever gone into effect. When the SEC adopted Securities Act Rule 151A to regulate FIA sales in 2009, it acknowledged that it had not previously regulated these products, and provided that the new regulation would apply only prospectively—to products first issued after the effective date. 71 F.R. 3138, at 3139 (Jan. 16, 2009). The SEC specifically "acknowledge[d] that, as a result of indexed annuity issuers having historically offered and sold their contracts without complying with the federal securities laws, the Commission has not created specific disclosure requirements tailored to these products." 71 F.R. at 3148-49. Further, it provided that the regulation would not become effective for two years after adoption, during which period, "we intend to consider how to tailor disclosure requirements for indexed annuities." 71 F.R. at 3153.

Before Rule 151A took effect, the D.C. Circuit struck down Rule 151A, holding that the SEC failed to fulfill its statutory duty to assess the rule's impact on "efficiency, competition, and capital formation"[12] because, in part, it failed to consider "disclosure under state law" and "whether, under the existing regime, sufficient protections existed."[13] Shortly after the *American*

---

[12] 15 U.S.C. § 77b(b) (Securities Act of 1933, section 2(b)).

[13] *Am. Equity Life Insurance*, 613 F.3d at 177-79.

*Equity Life* decision, Congress passed the Dodd-Frank Act, section 989J, which made clear that FIAs meeting certain standards are not securities.

The SEC could have attempted to correct the deficiencies cited by the D.C. Circuit and proposed a new or modified rule, but in the wake of Dodd-Frank, it has never done so. As a result, it also never issued any guidance under this rule on "how to tailor disclosure requirements" for FIAs.

In this case, the SEC has not cited to any published guidance or other legal authority requiring this level of specificity. Indeed, in response to Defendants' Request for Admission that "the SEC has not issued any written guidance stating that an insurance agent who is also associated with a registered investment advisor must disclose the amount of his or her commission on the sale of a fixed indexed annuity," the SEC acknowledged that "we cannot point you to specific guidance that refutes RFA 7 as you have constructed it…" Pl.'s Supp. Resp. 2, ECF No. 81-1. Similarly, the SEC examiner, Mr. Prata, testified that he was unaware of any SEC instructions or guidance that requires disclosure of the specific amount or percentage of annuity commissions. Tr. 4/15/25 2-58:3–7 (Prata). Accordingly, he never told Mr. Cutter that he needed to make those detailed disclosures. Tr. 4/15/25 2-57:1–23 (Prata).

Ironically, the SEC does not challenge the adequacy of Defendants' written conflict of interest disclosure that it *does* require, on Form ADV. Indeed, the SEC has issued guidance suggesting that compensation details for non-securities products need *not* be disclosed. Amendments to Form ADV, Rel. No. IA-3060 at 17 (July 28, 2010), 75 Fed. Reg. 49234, 49238 (Aug. 12, 2010) (disclosures of non-securities compensation are "not required to include the amount or range of the fees…."). The SEC's case thus depends on its inchoate claim that Defendants' compliant written disclosure was "not enough," which is exactly the type of

litigation claim that the Second Circuit held was inappropriate in *Upton v. SEC*, 75 F.3d 92, 98

(2d Cir. 1996) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)) (the SEC must

"give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.").

## IV.    Alternatively, the Court Should Grant a New Trial Under Rule 59

Despite limiting its Section 206(2) claim to breach of loyalty, the SEC elicited irrelevant

and unfairly prejudicial testimony suggesting that Defendants made unsuitable recommendations

and that Defendants' customers were harmed by Defendants' recommendations of FIAs and

other transactions, while Defendants were not allowed the opportunity to present evidence

refuting such claims or inferences. *See Gomez v. Rivera Rodriguez*, 344 F.3d 103, 120 (1st Cir.

2003) (cumulative effect of evidentiary errors may have "tipped the decisional scales" and

warranted new trial).

### A.    Customer Testimony Suggesting Harm or
### Unsuitable Advice Should Have Been Excluded

The SEC represented to Defendants and this Court that it did not intend to present

evidence of harm to any of Defendants' clients, because harm was not an element of the SEC's

claims: "[W]e've actually in our of our motions *we've agreed not to introduce evidence of what*

*someone may have lost in surrendering their annuity.*" Ex. 1, Final Pre-Trial Conf. Tr., at 40:19-

25 (emphasis added). Indeed, the SEC successfully sought to preclude Defendants from offering

evidence that their clients were not harmed on that same basis. ECF No. 146. The SEC also

bindingly disclosed in responses to Requests for Admission that it "has not alleged that any of

the insurance annuity products sold by Mr. Cutter were unsuitable" and that "[t]he Commission

takes no position on the suitability of any particular insurance product offered and/or sold to Mr.

Cutter's advisory clients." Pl. Resp. to Req. for Admins., Nos. 16-35, ECF No. 117-02. And the

SEC successfully sought to preclude the testimony of Defendants' expert, Theodore Nickel, that

26

the annuity products Mr. Cutter sold to his client *were* suitable for them. ECF No. 146. Yet the

SEC elicited testimony concerning both categories of evidence: that Mr. Cutter's clients were

harmed by Mr. Cutter's recommendations and that those recommendations were not suitable for

them. To list just a few examples:

Harm Testimony:

- The SEC asked Joan Thompson whether "Mr. Cutter [said] that there would be any kind of charge associated with replacing your existing annuity with a new one." Tr. 4/15/25 2-129:16–18 (Thompson).

- The SEC questioned Michael Larkin about a "tax result" from the sale of his securities. Tr. 4/16/25 3-102:12 (Larkin). Mr. Larkin responded that "Yes, there was" and that his "accountant need[ed] $17,000 that we had to take out of our existing assets … to pay those quarterly fees in advance." Tr. 4/16/25 3-102:13–16 (Larkin).

- The SEC elicited testimony from Ms. Ridenour that she "cried" when she "found out [she] had to pay $16,000 in taxes" in 2022. Tr. 4/17/25 37:9–15 (Ridenour).

Suitability Testimony:

- The SEC elicited testimony from Stephen McGuire that the replacement annuity Mr. Cutter sold him was not suitable for him because the replacement annuity did not contain a guaranteed income feature. *See* Tr. 4/15/25 165:11–16 (McGuire).

- The SEC elicited testimony from John Hanson that he "question[ed] the fit of the annuities" Mr. Cutter sold to him. Tr. 4/16/25 3-45:13–20 (Hanson).

- The SEC asked Pamela Doiron whether she "ask[ed] for an income rider" that came with annuities Mr. Cutter initially sold to her. Tr. 4/16/25 3-68:23–24 (Doiron).

- The SEC asked Susan Ridenour whether she told Cutter "that [she] wanted an income rider," which came with the annuity that Mr. Cutter sold to her. Tr. 4/17/25 26:9–10 (Ridenour). The SEC also asked Ms. Ridenour whether Cutter "talk[ed] to you generally about annuities having choices that can make enhanced death benefits or bigger beneficiary benefits." Tr. 4/17/25 26:21–24 (Ridenour).

- The SEC elicited testimony from Kim Webber that "there could have been a better product out there that [Mr. Cutter] didn't receive commission on that would have been better for me, but that was never an option. Tr. 4/17/25 70:18–20 (Webber).

The SEC should not have been permitted to present evidence concerning harm (including

evidence about surrender charges or tax consequences clients incurred), because, as the SEC

argued, harm is not an element of their case and is, therefore, irrelevant under Fed. R. Ev. 402. SEC Mot. in Limine to Exclude Irrelevant Evid. 14, ECF No. 102. And the SEC should not have been permitted to present evidence concerning the suitability of Mr. Cutter's annuity recommendations, because it expressly disavowed any such claim in its responses to Defendants requests for admission. The SEC should not have been allowed to change course at trial. Furthermore, allowing this testimony—without also allowing Defendants to present evidence that Mr. Cutter's clients were not harmed and that Mr. Cutter's recommendations were suitable for them—was unfairly prejudicial to Defendants under Fed. R. Ev. 403.

### B.    Theodore Nickel's Expert Testimony Was Improperly Excluded

The Court excluded Defendants' proffered expert, Theodore Nickel, not for failure to satisfy expert standards under Fed. R. Evid. 702, but for lack of relevance or risk of confusing the jury under Fed. R. Evid. 401 and 403. The exclusion of expert testimony on a specialized standard of care in a negligence case on relevance grounds can be reversible error. *Martinez v. United States* 33 F.4th 20, 27-30 (1st Cir. 2022) (medical standard of care). The First Circuit has also cautioned that:

> When conducting the Rule 403 balancing test, courts must heed that the default rule is that relevant evidence will be admitted. *See United States v. Jones*, 689 F.3d 12, 19 (1st Cir. 2012). And it is not enough for Rule 403 that the evidence's dangers of unfair prejudice or confusion somewhat outweigh the probative value of the evidence. *See United States v. Trenkler*, 61 F.3d 45, 56 (1st Cir. 1995) … Rule 403 permits exclusion not when the evidence is merely outweighed by the dangers of its admission, but only when it is "substantially outweighed." See Fed. R. Evid. 403 (emphasis added).

*U.S. v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022) (emphasis in original).

When a defendant's understanding of industry standards or the applicable law is an element of the case, expert testimony may be admitted as relevant to the defendant's state of mind. *Adams v. New England Scaffolding, Inc.*, No. CV 13-12629-FDS, 2015 WL 9412518, at

*8-9 (D. Mass. Dec. 22, 2015) (OSHA rules); *see Gomez*, 344 F.3d at 115 (testimony of municipal counsel admissible to show defendant's understanding of the law); *Vasquez-Valentin v. Santiago-Diaz*, 459 F.3d 144, 151-52 (1st Cir. 2006) (documents reflecting defendant's concerns about legal exposure in employment decision).

In this matter, Mr. Nickel's testimony would have been relevant to and informative to the jury about several issues in the case:

1. The objective reasonableness of Mr. Cutter's disclosure practices.

   a. Mr. Cutter met insurance industry standards for FIA disclosures of commissions. 12/9/2024 Nickel Report ¶¶51-2, ECF No. 161-01.

   b. The allegedly omitted commission details, including amount and timing, were not material, because: FIA commissions are paid by the insurance company and do not reduce the customer's contract value. *Id*. ¶43. FIA commission rates are set by the insurance companies and do not change the terms of the FIAs as offered to individuals. Insurance regulations accordingly prioritize disclosure of withdrawal charges that the customer might have to pay. *Id*.

2. Mr. Cutter's recommendations of FIAs to clients were consistent with insurance industry standards and suitable and consistent with his pre-announced strategy. As noted above, the SEC's claims that Mr. Cutter's recommendations to certain customers were not suitable raised the issue of compliance with the duty of care. Mr. Nickel's testimony would have enabled Defendants to rebut those claims, by explaining that Mr. Cutter's FIA recommendations to each of the named customers were suitable under insurance industry standards in light of the customers' objectives and financial situations. *Id*. ¶¶53–64 (initial sales), 80–92 (replacements).

3. Mr. Cutter's conduct of his business was not consistent with churning— excessive replacement activity to generate commissions. *Id*. ¶16.

4. The statements to insurance companies on replacement applications were not incorrect or misleading in context, because the statements correctly responded to the insurance companies' reasonable concerns about whether a client was giving up an income feature that was important to their needs. *Id*. ¶90. For the same reasons, these statements were not material to a reasonable insurance company's replacement evaluation.

**C.      Dr. Lemayian's Proffered Testimony on the
         <u>Performance of FIAs was Improperly Excluded</u>**

Similarly, because the SEC was permitted to present evidence of harm incurred by certain

clients, Dr. Lemayian's proposed testimony about the post-purchase performance of replaced

FIAs was relevant to the same issue. Moreover, evidence of lack of harm would have been no

more confusing or prejudicial than the SEC's claims of harm. Dr. Lemayian found that the

customers who purchased replacement annuities enjoyed better contract value performance

during the relevant period than they would have if they had kept their original annuities.

Lemayian Report ¶¶ 163–180, 184–186. This would have both supplemented Dr. Lemayian's

finding that the replacement products were suitable at the time of the recommendation, and

refuted the SEC's claim that the replacements harmed these customers.

**D.      <u>Redtail Notes Were Improperly Excluded</u>**

The Court did not allow Defendants to introduce evidence from the Defendants'

contemporaneous client record-keeping system, called Redtail. *See* Exs. AE, AW, BP, CD, CV-

1, CX, EB; Tr. 4/17/25 175:16–176:4.[14] Redtail is CFG's client relationship management tool

used by CFG employees to record notes about meetings or calls with clients and client-related

actions. Tr. 4/18/25 5-57:9–16 (Jeffrey Cutter). First, the Redtail notes were not offered for their

truth but to show regular meetings and communications took place with clients and Mr. Cutter's

state of mind at the time. *Kassel v. Gannett Co.*, 875 F.2d 935, 945 (1st Cir. 1989) (investigative

report was not hearsay when offered to show the VA's state of mind); *Garcia v. Sprint PCS

Caribe*, 841 F. Supp. 2d 538, 544-45 (D.P.R. 2012) (interview notes which contained statements

by employees were not hearsay because they were being offered to show actions taken by

---

[14] In an effort to address Plaintiff's objections, Defendants also offered redacted versions of these exhibits, which
were also excluded by the Court.

company as part of its disciplinary procedures); *Espedito Realty, LLC v. Nat'l Fire Ins. Co. of Hartford*, 935 F. Supp. 2d 319, 325 n.3 (D. Mass. 2013) (finding emails were admissible under business records exception where the "emails are not offered to prove the truth of the matters asserted in them, but only to show that the communications occurred."). Second, the Redtail notes may be offered for their truth because they fall squarely within the business record exception to the hearsay rule, under Fed. R. Evid 803(6): they were made at or near the time of the events, by persons with knowledge of the events, as part of a regular practice of a regularly conducted business. *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (business planner containing notes of phone conversations met business record exception).

In addition to showing Defendants' general practice of diligent client service and communications, certain Redtail notes were relevant to specific disputed factual issues. First, Exhibit EB, a Redtail note relating to Mr. Larkin, meets the requirements of Rule 803(6). The note shows a call between Mr. Cutter and Mr. Larkin was scheduled on April 20, 2015 at 8AM, and at 8:51AM, a note describing the call is entered by Mr. Cutter. Ex. EB. The note reflects that the call took place and the timing of Mr. Larkin's authorization for a trade at issue in the case. Ex. EB. Mr. Cutter testified to the requirements of Rule 803(6), including that Redtail notes were kept in the regular course of CFG's business, were a regular practice of CFG as it routinely used Redtail to document interactions for all of its clients. Tr. 4/18/25 5-57:9–18 (Jeffrey Cutter). Further the Redtail notes were produced by the CRM company which contained the relevant metadata of who entered the note and when. As to trustworthiness, the final factor, it is Plaintiff's burden to show the Redtail notes were not trustworthy. Plaintiff did not make an adequate showing that the Redtail notes as a whole or any in particular was untrustworthy only referencing the three prior days of testimony as going towards trustworthiness. Trial Tr. 4/17/25

31

6:23–7:5 (Burkart). Even still, credibility is for the jury to determine. "In fact, courts should not focus on questions regarding the accuracy of a record in making the trustworthiness determination required by Rule 803, because the jury is responsible for assessing credibility and deciding what weight to afford admitted evidence." *United States v. Smith*, 804 F.3d 724, 729 (5th Cir. 2015) (internal citation omitted). Plaintiff sought to impeach Mr. Cutter concerning an entry in the Redtail notes which supposedly contradicted Mr. Cutter's testimony. Trial Tr. 4/18/25 5-109:12–22 (Jeffrey Cutter). If the Redtail notes were not trustworthy it is unclear how Plaintiff could rely on them for impeachment.

Second, the Court should not have excluded Exhibit CD, the Redtail notes relating to Ms. Ridenour. Exhibit CD shows the absence of any note concerning a conversation between Ms. Ridenour and Mr. Cutter about taxes, undermining her testimony to the contrary. Under Fed. Rule of Evid. 803(7) absence of a business record is also an exception to the rule against hearsay if the evidence is admitted to prove the incident did not occur, the record is regularly kept, and the opponent does not show the source of information lacks trustworthiness. Fed. Rule Evid. 803(7). Exhibit CD reflects that CFG's receptionist added a note on March 7, 2022 at 1:40PM indicating she spoke to Ms. Ridenour regarding questions about her taxes. Ex. CD. The receptionist added in the note that another CFG employee should call Ms. Ridenour back by the end of the day to discuss her concerns. Ex. CD. Later that day, at 2:46PM the other CFG employee added a note in Redtail indicating she called Ms. Ridenour and summarized the conversation regarding Ms. Ridenour's tax concerns. Ex. CD. No note shows Ms. Ridenour ever spoke to Mr. Cutter about her tax concerns, the Redtail notes were regularly kept, and Plaintiff made no argument as to the trustworthiness of these two separate CFG employees.

32

E.     **The Court Improperly Excluded 84-24 Forms**

The Court excluded two Department of Labor PTE 84-24 Disclosure and Acknowledgment Forms ("Form 84-24 Disclosures") and precluded Jennifer Farrington from testifying about them. As a result of the Court's ruling, Defendants were precluded from presenting evidence relevant to the materiality of FIA commission amounts.

During part of the relevant period, clients who purchased FIA in qualified retirement accounts received and signed a Form 84-24 Disclosure, which expressly stated the FIA commission percentage received by Defendants. Jennifer Farrington testified that she reviewed the Form 84-24 in connection with her compliance activities and that her "role was to see that it was appropriate for the conflicts of interest disclosures." Tr. 4/18/25 5-241:14–17 (Farrington). Defendants were precluded from eliciting further testimony from Ms. Farrington that Exhibits FM-1 and FM-2 were examples of Form 84-24 Disclosures, which were identical in form to Form 84-24 Disclosures that were used with 98 clients who purchased FIA, that she had personally reviewed Form 84-24 Disclosures for these 98 clients, and that that none of the 98 clients who received and signed Form 84-24 Disclosures declined to purchase an annuity after receiving the disclosure. Exs. FM-1, FM-2.

Whether an alleged fact is material depends on all the relevant circumstances existing at the time the statements were made. *Navellier & Assoc.*, 108 F.4th at 37; *see also Basic v. Levinson*, 485 U.S. 224, 236 (1988). Ms. Farrington's testimony that about 20% of Defendants' customers who purchased FIAs during the relevant period received these disclosures bears directly on that question. And the fact that no client declined to purchase an FIA after obtaining the additional disclosure of the amount of Mr. Cutter's commission is evidence that the amount of the commission is not material information. Defendants did not intend to introduce evidence of any clients' state of mind—only that they signed the Form 84-24 Disclosure and continued

with the purchase of an annuity. Although Mr. Cutter did not testify about the forms, Ms. Farrington could have done so. She is the current chief compliance officer of CFG and has personal knowledge of the Form 84-24 Disclosures as a key employee of CFG.

The SEC knew about Form 84-24 Disclosures throughout the investigation that led to this action and they were further disclosed in written discovery responses. Plaintiff could have sought evidence from any of the clients who signed a Form 84-24 Disclosure. The fact that Plaintiff's cherry-picked client witnesses did not sign Form 84-24 Disclosures should not have been a basis to preclude Defendants from offering this relevant evidence.

Due to the exclusion of the Form 84-24 Disclosures, Defendants were precluded from showing the jury that they did disclose commissions and the portion of clients who signed the disclosures still continued with purchasing an annuity.

### F.    <u>Necessary Jury Instructions Were Not Given</u>

The Court erred in not instructing the jury as to receipt of compensation, fair notice, the business of insurance, and the statute of limitations. In addition, the jury should have been instructed that it was not being asked to evaluate whether any recommendation by Defendants was in the client's best interest. The jury instructions should have instructed the jury that a client can consent to a potential conflict of interest implicitly by entering into or continuing the advisory relationship. Tr. 4/23/25 33:5–34:7. Relatedly, the verdict form should have specified that a finding of liability under Section 206(2) could be premised only on an alleged failure to disclose a material conflict of interest. *Id*.

A party may be entitled to a new trial when the instructions, taken as a whole, are misleading or give an inadequate understanding of the law. *Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 278 (D. Mass. 1998); *Poulin v. Greer*, 18 F.3d 979, 983 n.3 (1st Cir.1994) (noting, in context of ruling on new trial motion, that the inquiry is to determine "whether the instructions as

34

given tend to confuse or mislead the jury with regard to the applicable principles of law"). The

court can also grant a new trial if it finds that an "omitted instruction 1) correctly stated the

substantive law, 2) was not substantially covered in the jury instructions as a whole, and 3) was

integral to an important point in the case." *Arborjet, Inc. v. Rainbow Treecare Sci.*

*Advancements, Inc.*, 187 F. Supp. 3d 217, 226 (D. Mass. 2016) (citation omitted).

Defendants proposed an instruction stating that the fact Defendants may have increased

revenue by recommending annuities did not alone support an inference that recommendations

were made without a reasonable belief they were in the clients' best interest. Proposed Jury Inst.

No. 20, ECF No. 127. This instruction accurately stated the law and was not covered by a

separate instruction. Comm. Interpretation Regarding Stand. of Conduct for Inv. Advisers, Rel.

No. IA-5248 at 17 (June 5, 2019); *Anderson*, 2024 WL 4120941 at *12-13; *Brennan*, 853 F.3d at

615 (rejecting allegation based on executive compensation incentives, including "performance-

based cash bonuses," which are common industry practices); *Corban*, 868 F.3d at 41-42 ("'[T]he

usual concern by executives to improve financial results' does not support an inference of

scienter."). It was also the critical point of Plaintiff's case: Defendants only made

recommendations to increase their profits regardless of clients' financial situation. The jurors

should have been instructed that the fact Defendants increased their revenue, without more, did

not support an inference the recommendations were not in the clients' best interest given

Plaintiff's allegations.

The Court also erred in not providing Defendants' fair notice defense instruction which

stated a law must be clear to warn a party of what is expected and if it fails provide a person of

ordinary intelligence with fair notice of what is prohibited, there can be no liability. Proposed

Jury Inst. No. 38, ECF No. 127. This instruction was not included despite being a fundamental

principle and one of Defendants' defenses. *Fox Television Stations*, 567 U.S. at 253; *W. Int'l Sec., Inc*., 2023 WL 2480732 at \*5-7; *see supra* Section III.

The Court also should have given Defendants' proposed instruction about the business of insurance defense, which would have allowed the jury to apply the provisions of the McCarran-Ferguson Act. As discussed above, if the jurors found Defendants' actions related solely to the business of insurance, those actions or omissions could not be a basis for a violation of the Advisers Act. Proposed Jury Instr. No. 39, ECF No. 127. This instruction was supported by the law and was not covered by any separate instruction. 5 U.S.C. § 1011 *et seq*; *see* Mass. Gen. Laws ch. 175, 176D; Mass. Gen. Laws. ch. 175 §§ 129, 132, 144A ½, 162-162Z, 204; ch. 176D, § 3; 211 Mass. Code. Regs. 34.00 (replacements), 96.00 (adoption of NAIC Model Rule 275); *see also Nat'l Sec., Inc*., 393 U.S. at 458-61 (state law governs "selling and advertising of policies," "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," and anything "directly or indirectly" relating to the "relationship between the insurance company and the policyholder."). Plaintiff's entire case related to Defendants sale of annuities, an insurance product, and the jurors should have been instructed regarding this defense.

The Court also should have instructed the jury that the statute of limitations applicable to Section 206(2) barred claims for conduct before March 17, 2018. Again, this instruction was not covered by any other instructions, and it accurately stated the law. *Gabelli v. SEC*, 568 U.S. 442, 448 (2013); 15 U.S.C. § 78u(d)(8). The statute of limitations instruction was vital to the Defendants' case, especially given the jury's verdict. Two of the client witnesses, John Hanson and Michael Larkin, had stopped being clients of Mr. Cutter years before the statute of limitations had run and the jury should have been instructed on the issue before reaching their

verdict. In the absence of this instruction, the jury could have premised its Section 202(2) determination on events that took place outside the limitations period.

Additionally, some instructions or lack thereof made it so that the instructions as a whole gave an inadequate understanding of the law. For example, the jury was not instructed that they were not being asked to evaluate whether any recommendation by Defendants was in the client's best interest, even though the SEC elicited testimony from Ms. Doiron that she had "enough annuities" and "didn't need another annuity." Tr. 4/16/25 3-74:23–3-75:15 (Doiron); *see supra* Section IV.A. Representatives for Athene and Nationwide also testified as to when specific riders would be appropriate for a client and that the purpose of sections of the application were to make sure the product was "a good fit" and "goals, needs, objectives and their current financial status are aligned with the purchase." Tr. 4/15/25 2-71:22–25, 2-72:1–6, 2-79:2–19, 2-80:2–12, 2-80:16–2-81:6 (Milligan); Tr. 4/16/25 3-153:10–25 (Van Cleave). They were also asked about the purpose of asking about replacements, the purpose and importance of suitability guidelines, questions, and the suitability review process, how important the standard of care review process was, and whether there was suitability training for insurance agents. Tr. 4/15/25 2-75:20–25, 2-86:23–2-88:2, 2-88:5–2-88:13, 2-89:17–2-91:15, 2-91:19–2-92:3 (Milligan); Tr. 4/16/25 3-146:22–25, 3-149:1–3-151:5, 3-152:2–24, 3-155:14–3-156:13, 3-156:21–3-157:23 (Van Cleave). These questions and their responses put an undue emphasis on whether the annuities were in the clients' best interest without an instruction to the jury that they were not asked to evaluate the recommendation. Furthermore, the jury should have been instructed that it could not find liability under Section 206(2), a negligence claim, based on an assumption that an annuity was inappropriate for a client.

37

The jury was instructed that a client must give consent to a potential conflict of interest, but it was not instructed about the ways a client could give implicit consent. For example, a client may have consented to a potential conflict of interest by entering into or continuing the advisory relationship, which is exactly what happened here. Comm. Interpretation Regarding Stand. of Conduct for Inv. Advisers, Rel. No. IA-5248 at 21-29 (June 5, 2019). Client witnesses signed documents which disclosed the conflict of interest and still continued their advisory relationship with Defendants. Trial Exs. 100, 101, 117, 176, 197, 200, 214. Specifically, Ms. Ridenour testified Mr. Cutter told her he earned a commission on the sale of the annuity, and she later signed a new investment management agreement after being told of the conflict of interest thus giving her implied consent. 4/17/25 54:20–55:3; 61:16–62:13 (Ridenour). The jury should have been instructed, in line with the SEC's guidance, that consent to a conflict of interest may be implicit by continuing the advisory relationship.

Relatedly, the verdict form did not specify that a finding of liability under Section 206(2) could be based only on an alleged failure to disclose a conflict of interest that was *material to a reasonable investor*. ECF No. 170; *see supra* Section I.C, (materiality standard). Materiality was put at issue by, among others, two client witnesses who testified that they were aware Mr. Cutter earned a commission on the sale of the annuities and chose not to not ask about the amount. Tr. 4/16/25 3-83:6–12 (Doiron); Tr. 4/17/25 54:20–55:11 (Ridenour). Several others expressed no interest in the subject. *See supra* Section I.C. Therefore, the verdict form should have made clear to the jurors that Defendants could only be found liable on two of the claims if they believed the commissions were material and Defendants failed to disclose them.

### G. The SEC Should Have Been Compelled to Admit That It Never Issued Guidance That RIAs Were Required To Disclose The Amount Of Insurance Commissions

Finally, the Defendants were denied the opportunity to present to the jury a binding admission of a truthful fact that is materially relevant to the determination of whether Defendants acted reasonably: that the SEC never issued any guidance requiring investment advisers to disclose the amount of their commissions on FIA sales.

The SEC's claim under Section 206(2) required a jury finding that Defendants acted negligently. *SEC v. Cutter Fin. Grp., LLC*, No. 23-CV-10589-DJC, 2023 WL 8653927, at *6 (D. Mass. Dec. 14, 2023). One of Defendants' defenses has always been that they could not have reasonably known of a purported obligation to disclose the amount of insurance commissions. *See, e.g.*, Am. Answer, Defense 18, ECF 65 (Jan. 11, 2024). The fact that the SEC itself has never issued guidance to registered investment advisers that insurance commission amounts must be disclosed is relevant to the issue of what Defendants could reasonably have known about the scope of their duty of loyalty.

There is no federal statute, SEC regulation, or SEC guidance that requires investment advisers who are also insurance agents to disclose the amount of their insurance commissions (as opposed to the *fact* of their commissions, which *was* disclosed). In fact, the SEC has issued guidance suggesting that these amounts need not be disclosed. Amendments to Form ADV, Rel. No. IA-3060 at 17 (July 28, 2010), 75 Fed. Reg. 49234, 49238 (Aug. 12, 2010) (disclosures of non-securities compensation are "not required to include the amount or range of the fees…."). State insurance regulations also provide that insurance agents do *not* have to disclose the amount of their commissions unless asked by the customer, and that the amount of the commission is *not* a material conflict of interest. 211 MCR §§ 96.05(1)(b)1 and 2; 96.04 ("Material conflict of

interest does not include cash compensation or non-cash compensation."). And no federal guidance suggests that those regulations do not apply to investment advisers who sell insurance.

Defendants' Request for Admission 7 ("RFA 7") sought an admission that, "The SEC has not issued any written guidance stating that an insurance agent who is also associated with a registered investment advisor must disclose the amount of his or her commission on the sale of a fixed indexed annuity." ECF No. 81-1. A request for admission may address anything within the scope of Rule 26(b)(1) – i.e., any nonprivileged matter relating to "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 26(b)(1), 36(a)(1)(A). The Rules do not permit "evasive or incomplete" answers. *Campbell v. Isolation Techs., Inc.*, No. CV 04-40236-FDS, 2005 WL 8176501, at *2 (D. Mass. Oct. 19, 2005). The fact that a party "disagrees with the premise of a request for admission is not grounds for not answering." *AMAG Pharma., Inc. v. Am. Guarantee and Liab. Ins. Co.*, No. 21-cv-10618-LTS, 2022 WL 16950437, *10 (D. Mass. Nov. 15, 2022). When a party has "no reasonable basis to deny" a request for admission relevant to an element of the case, the court may deem the matter admitted or award sanctions. *Marchand v. Mercy Medical Ctr.*, 22 F.3d 933, 938 (9th Cir. 1994) (causation). The standards regarding requests for admission apply with equal force to the SEC. *SEC v. Happ*, 392 F.3d 12, 33-34 (1st Cir. 2004) (affirming sanctions against the SEC for refusing to admit or stipulate to the absence of a phone call until midway through trial). For these reasons, the SEC should have been compelled to admit RFA 7 and the jury should have been permitted to hear its admission.

**Conclusion**

For these reasons, the Court should enter judgment as a matter of law in favor of Defendants on the SEC's claim under Advisers Act Section 206(2) or in the alternative, grant a new trial on that claim.

Dated: May 21, 2025                       Respectfully submitted,

*/s/ Ian D. Roffman*
Ian D. Roffman (BBO# 637564)
*iroffman@nutter.com*
Mark C. Jensen (BBO# 646662)
*mjensen@nutter.com*
Melanie V. Woodward (BBO# 690906)
*mwoodward@nutter.com*
Natalia Pena (Bar. No. 707596)
*nepena@nutter.com*
Nutter McClennen & Fish LLP
Seaport West
155 Seaport Blvd.
Boston, MA 02210-2604
(617) 439-2421 (Roffman)

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that, on May 21, 2025, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Ian D. Roffman

7223520